# SCHWARE *v.* BOARD OF BAR EXAMINERS OF NEW MEXICO.

No. 92.   Argued January 14–15, 1957.—Decided May 6, 1957.

*Herbert Monte Levy* argued the cause and filed a brief for petitioner.

*William A. Sloan* and *Fred M. Standley,* Attorney General of New Mexico, argued the cause and filed a brief for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

The question presented is whether petitioner, Rudolph Schware, has been denied a license to practice law in New Mexico in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

New Mexico has a system for the licensing of persons to practice law similar to that in effect in most States.[1] A Board of Bar Examiners determines if candidates for admission to the bar have the necessary qualifications. When the Board concludes that an applicant qualifies

---

[1] Generally, see N. M. Stat. Ann., 1953, § 18–1–8 and the Rules Governing Admission to the Bar appended thereto.

234

it recommends to the State Supreme Court that he be admitted. If the court accepts the recommendation, the applicant is entitled to practice law upon taking an oath to support the constitutions and laws of the United States and New Mexico. An applicant must pass a bar examination before the Board will give him its recommendation. The Board can refuse to permit him to take this examination unless he demonstrates that he has "good moral character."

In December 1953, on the eve of his graduation from the University of New Mexico School of Law, Schware filed an application with the Board of Bar Examiners requesting that he be permitted to take the bar examination scheduled for February 1954. His application was submitted on a form prescribed by the Board that required answers to a large number of questions. From the record, it appears that he answered these questions in detail. Among other things, he disclosed that he had used certain aliases between 1933 and 1937 and that he had been arrested on several occasions prior to 1940. When he appeared to take the examination, the Board informed him that he could not do so. He later requested a formal hearing on the denial of his application. The Board granted his request. At the hearing the Board told him for the first time why it had refused to permit him to take the bar examination. It gave him a copy of the minutes of the meeting at which it had voted to deny his application. These minutes read:

"No. 1309, Rudolph Schware. It is moved by Board Member Frank Andrews that the application of Rudolph Schware to take the bar examination be denied for the reason that, taking into consideration the use of aliases by the applicant, his former connection with subversive organizations, and his record of arrests, he has failed to satisfy the Board as to the

requisite moral character for admission to the Bar of New Mexico. Whereupon said motion is duly seconded by Board Member Ross L. Malone, and unanimously passed." [2]

At the hearing petitioner called his wife, the rabbi of his synagogue, a local attorney and the secretary to the dean of the law school to testify about his character.[3] He took the stand himself and was thoroughly examined under oath by the Board. His counsel introduced a series of letters that petitioner had written his wife from 1944 through 1946 while he was on duty in the Army. Letters were also introduced from every member of petitioner's law school graduating class except one who did not comment. And all of his law school professors who were then available wrote in regard to his moral

---

[2] Apparently the Board had received confidential information that Schware had once been a member of the Communist Party. The Board's application form did not request disclosure of such information and so Schware did not mention it in his application. At the hearing he testified at length about his membership. The Board refused to let petitioner see the confidential information against him, although it appears that its initial denial of his application was partially based on this information. While this secret evidence was not made a part of the record of the hearing, counsel for petitioner contends that the Board was influenced by it in adhering to its view that petitioner was not qualified. In the New Mexico Supreme Court the members of the majority did not look at the confidential information. And while that court passed on petitioner's qualifications in the exercise of its original jurisdiction, the majority placed considerable reliance on the Board's recommendations. Therefore, petitioner contends, the Board's use of confidential information deprived him of procedural due process. Cf. *Goldsmith* v. *United States Bd. of Tax Appeals*, 270 U. S. 117; *Bratton* v. *Chandler*, 260 U. S. 110; *Minkoff* v. *Payne*, 93 U. S. App. D. C. 123, 210 F. 2d 689, 691; *In re Carter*, 89 U. S. App. D. C. 310, 192 F. 2d 15, cert. denied, 342 U. S. 862. We find it unnecessary to consider this contention.

[3] The dean was on sabbatical leave and not available.

character. The Board called no witnesses and introduced no evidence.

The record of the formal hearing shows the following facts relevant to Schware's moral character. He was born in a poor section of New York City in 1914 and grew up in a neighborhood inhabited primarily by recent immigrants. His father was an immigrant and like many of his neighbors had a difficult time providing for his family. Schware took a job when he was nine years old and throughout the remainder of school worked to help provide necessary income for his family. After 1929, the economic condition of the Schware family and their neighbors, as well as millions of others, was greatly worsened. Schware was then at a formative stage in high school. He was interested in and enthusiastic for socialism and trade-unionism as was his father. In 1932, despairing at what he considered lack of vigor in the socialist movement at a time when the country was in the depths of the great depression, he joined the Young Communist League.[4] At this time he was 18 years old and in the final year of high school.

From the time he left school until 1940 Schware, like many others, was periodically unemployed. He worked at a great variety of temporary and ill-paying jobs. In 1933, he found work in a glove factory and there he participated in a successful effort to unionize the employees. Since these workers were principally Italian, Schware assumed the name Rudolph Di Caprio to forestall the effects of anti-Jewish prejudice against him, not only in securing and retaining a job but in assisting in the organization of his fellow employees. In 1934 he went to California where he secured work on the

---

[4] At times during 1932 more than 12,060,000 of the nation's 51,000,000 working persons were unemployed. Statistical Abstract of the United States (1956) 197.

docks. He testified that he continued to use the name Rudolph Di Caprio because Jews were discriminated against in employment for this work. Wherever Schware was employed he was an active advocate of labor organization. In 1934 he took part in the great maritime strikes on the west coast which were bitterly fought on both sides. While on strike in San Pedro, California, he was arrested twice on "suspicion of criminal syndicalism." He was never formally charged nor tried and was released in each instance after being held for a brief period. He testified that the San Pedro police in a series of mass arrests jailed large numbers of the strikers.

At the time of his father's death in 1937 Schware left the Communist Party but later he rejoined. In 1940 he was arrested and indicted for violating the Neutrality Act of 1917. He was charged with attempting to induce men to volunteer for duty on the side of the Loyalist Government in the Spanish Civil War. Before his case came to trial the charges were dismissed and he was released. Later in 1940 he quit the Communist Party. The Nazi-Soviet Non-Aggression Pact of 1939 had greatly disillusioned him and this disillusionment was made complete as he came to believe that certain leaders in the Party were acting to advance their own selfish interests rather than the interests of the working class which they purported to represent.

In 1944 Schware entered the armed forces of the United States. While in the service he volunteered for duty as a paratrooper and was sent to New Guinea. While serving in the Army here and abroad he wrote a number of letters to his wife. These letters show a desire to serve his country and demonstrate faith in a free democratic society. They reveal serious thoughts about religion which later led him and his wife to associate themselves with a synagogue when he returned to civilian

life. He was honorably discharged from the Army in 1946.

After finishing college, he entered the University of New Mexico law school in 1950. At the beginning he went to the dean and told him of his past activities and his association with the Communist Party during the depression and asked for advice. The dean told him to remain in school and put behind him what had happened years before. While studying law Schware operated a business in order to support his wife and two children and to pay the expenses of a professional education. During his three years at the law school his conduct was exemplary.

At the conclusion of the hearing the Board reaffirmed its decision denying Schware the right to take the bar examination. He appealed to the New Mexico Supreme Court. That court upheld the denial with one justice dissenting. 60 N. M. 304, 291 P. 2d 607. In denying a motion for rehearing the court stated that:

> "[Schware's membership in the Communist Party], together with his other former actions in the use of aliases and record of arrests, and his present attitude toward those matters, were the considerations upon which [we approved the denial of his application]."

Schware then petitioned this Court to review his case alleging that he had been denied an opportunity to qualify for the practice of law contrary to the Due Process Clause of the Fourteenth Amendment. We granted certiorari. 352 U. S. 821. Cf. *In re Summers*, 325 U. S. 561, 562, 564–569. And see *Konigsberg* v. *State Bar of California, post,* p. 252, decided this day.

A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protec-

tion Clause of the Fourteenth Amendment.[5] *Dent* v. *West Virginia,* 129 U. S. 114. Cf. *Slochower* v. *Board of Education,* 350 U. S. 551; *Wieman* v. *Updegraff,* 344 U. S. 183. And see *Ex parte Secombe,* 19 How. 9, 13. A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. *Douglas* v. *Noble,* 261 U. S. 165; *Cummings* v. *Missouri,* 4 Wall. 277, 319–320. Cf. *Nebbia* v. *New York,* 291 U. S. 502. Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory. Cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356.

Here the State concedes that Schware is fully qualified to take the examination in all respects other than good moral character. Therefore the question is whether the Supreme Court of New Mexico on the record before us could reasonably find that he had not shown good moral character.

There is nothing in the record which suggests that Schware has engaged in any conduct during the past 15 years which reflects adversely on his character. The New Mexico Supreme Court recognized that he "presently

---

[5] We need not enter into a discussion whether the practice of law is a "right" or "privilege." Regardless of how the State's grant of permission to engage in this occupation is characterized, it is sufficient to say that a person cannot be prevented from practicing except for valid reasons. Certainly the practice of law is not a matter of the State's grace. *Ex parte Garland,* 4 Wall. 333, 379.

enjoys good repute among his teachers, his fellow students and associates and in his synagogue." Schware's professors, his fellow students, his business associates and the rabbi of the synagogue of which he and his family are members, all gave testimony that he is a good man, a man who is imbued with a sense of deep responsibility for his family, who is trustworthy, who respects the rights and beliefs of others. From the record it appears he is a man of religious conviction and is training his children in the beliefs and practices of his faith. A solicitude for others is demonstrated by the fact that he regularly read the Bible to an illiterate soldier while in the Army and law to a blind student while at the University of New Mexico law school. His industry is depicted by the fact that he supported his wife and two children and paid for a costly professional education by operating a business separately while studying law. He demonstrated candor by informing the Board of his personal history and by going to the dean of the law school and disclosing his past. The undisputed evidence in the record shows Schware to be a man of high ideals with a deep sense of social justice. Not a single witness testified that he was not a man of good character.

Despite Schware's showing of good character, the Board and court below thought there were certain facts in the record which raised substantial doubts about his moral fitness to practice law.

(1) *Aliases.*—From 1934 to 1937 Schware used certain aliases. He testified that these aliases were adopted so he could secure a job in businesses which discriminated against Jews in their employment practices and so that he could more effectively organize non-Jewish employees at plants where he worked. Of course it is wrong to use an alias when it is done to cheat or defraud another but it can hardly be said that Schware's attempt to forestall anti-Semitism in securing employment or organizing

his fellow workers was wrong. He did give an assumed name to police in 1934 when he was picked up in a mass arrest during a labor dispute. He said he did this so he would not be fired as a striker. This is certainly not enough evidence to support an inference that petitioner has bad moral character more than 20 years later.

(2) *Arrests.*—In response to the questions on the Board's application form Schware stated that he had been arrested on several occasions:

1. In 1934, while he was participating in a bitter labor dispute in the California shipyards, petitioner was arrested at least two times on "suspicion of criminal syndicalism." After being held for a brief period he was released without formal charges being filed against him. He was never indicted nor convicted for any offense in connection with these arrests.

The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct.[6] An arrest shows nothing more than that someone probably suspected the person apprehended of an offense. When formal charges are not filed against the arrested person and he is released without trial, whatever probative force the arrest may have had is normally dissipated. Moreover here, the special facts surrounding the 1934 arrests are relevant in shedding light on their present significance. Apparently great numbers of strikers were picked up by police in a series of arrests during the strike at San Pedro and many of these were charged with "criminal syndicalism."[7] The California syndi-

---

[6] Arrest, by itself, is not considered competent evidence at either a criminal or civil trial to prove that a person did certain prohibited acts. Cf. Wigmore, Evidence, § 980a.

[7] Petitioner testified that during a two-month period about 2,000 persons were arrested in connection with the strike. Generally, for criticism of these arrests and the conduct of the police during these and related strikes see S. Rep. No. 1150, 77th Cong., 2d Sess. 35, 131, 133–141.

calism statutes in effect in 1934 were very broad and vague.[8] There is nothing in the record which indicates why Schware was arrested on "suspicion" that he had violated this statute. There is no suggestion that he was using force or violence in an attempt to overthrow the state or national government. Again it should be emphasized that these arrests were made more than 20 years ago and petitioner was never formally charged nor tried for any offense related to them.

2. In 1940 Schware was arrested for violating the Neutrality Act of 1917 which makes it unlawful for a person within the United States to join or to hire or retain another to join the army of any foreign state.[9] He was indicted but before the case came to trial the prosecution dropped the charges. He had been charged with recruiting persons to go overseas to aid the Loyalists in the Spanish Civil War. Schware testified that he was unaware of this old law at the time. From the facts in the record it is not clear that he was guilty of its violation.[10] But even if it be assumed that the law was violated, it does not seem that such an offense indicated moral turpitude—even in 1940. Many persons in this country actively supported the Spanish Loyalist Government. During the prelude to World War II many idealistic young men volunteered to help causes they believed right. It is commonly known that a number of Ameri-

---

[8] "The term 'criminal syndicalism' as used in this act is hereby defined as any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change." Cal. Stat. 1919, c. 188, § 1. See also *De Jonge* v. *Oregon*, 299 U. S. 353, where application of a similar statute was held unconstitutional.

[9] 40 Stat. 39, now 18 U. S. C. § 959 (a).

[10] See Kiker, J. (dissenting), 60 N. M. 304, 321, 291 P. 2d 607, 618.

cans joined air squadrons and helped defend China and Great Britain prior to this country's entry into the war. There is no record that any of these volunteers were prosecuted under the Neutrality Act. Few Americans would have regarded their conduct as evidence of moral turpitude. In determining whether a person's character is good the nature of the offense which he has committed must be taken into account.[11]

In summary, these arrests are wholly insufficient to support a finding that Schware had bad moral character at the time he applied to take the bar examination.[12] They all occurred many years ago and in no case was he ever tried or convicted for the offense for which he was arrested.

(3) *Membership in the Communist Party.*—Schware admitted that he was a member of the Communist Party from 1932 to 1940. Apparently the Supreme Court of New Mexico placed heavy emphasis on this past membership in denying his application.[13] It stated:

"We believe one who has knowingly given his loyalties to [the Communist Party] for six to seven

---

[11] For example, New Mexico makes conviction of a felony or a misdemeanor grounds for disbarment only if it involves moral turpitude. N. M. Stat. Ann., 1953, § 18–1–17 (1). Compare *In re Burch*, 73 Ohio App. 97, 54 N. E. 2d 803, where, in a disbarment proceeding, conviction for violation of a federal statute for failing to register as an agent of the German Government in 1941 was held not to evidence moral turpitude.

[12] In 1941 Schware was arrested by police in Texas while driving a friend's car to the west coast. Apparently the police suspected the car was stolen. After a brief delay they became convinced that the car was rightfully in petitioner's possession and he was allowed to go on his way. This detention offers no proof of bad moral character and the State does not rely on it here.

[13] Petitioner argues that a State constitutionally cannot consider his membership in a lawful political party in determining whether he is qualified for admission to the bar. He contends that a denial based on such membership abridges the right of free political associa-

years during a period of responsible adulthood is a person of questionable character." 60 N. M., at 319, 291 P. 2d, at 617.

The court assumed that in the 1930's when petitioner was a member of the Communist Party, it was dominated by a foreign power and was dedicated to the violent overthrow of the Government and that every member was aware of this. It based this assumption primarily on a view of the nature and purposes of the Communist Party as of 1950 expressed in a concurring opinion in *American Communications Assn.* v. *Douds,* 339 U. S. 382, 422. However that view did not purport to be a factual finding in that case and obviously it cannot be used as a substitute for evidence in this case to show that petitioner participated in any illegal activity or did anything morally reprehensible as a member of that Party. During the period when Schware was a member, the Communist Party was a lawful political party with candidates on the ballot in most States.[14] There is nothing in the record that gives any indication that his association with that Party was anything more than a political faith in a political party. That faith may have been unorthodox. But as counsel for New Mexico said in his brief, "Mere unorthodoxy [in the field of political and social ideas] does not as a matter of fair and logical inference, negative 'good moral character.' "[15]

_____

tion guaranteed by the Fourteenth Amendment. Because of our disposition of this case, we find it unnecessary to pass on this contention.

[14] For example in 1936 its presidential nominee was on the ballot in 35 States, including New Mexico. Statistical Abstract of the United States (1937) 159.

[15] In *West Virginia State Board* v. *Barnette,* 319 U. S. 624, 642, this Court declared:

"If there is any fixed star in our constitutional constellation, it

Schware joined the Communist Party when he was a young man during the midst of this country's greatest depression. Apparently many thousands of other Americans joined him in this step.[16] During the depression when millions were unemployed and our economic system was paralyzed many turned to the Communist Party out of desperation or hope. It proposed a radical solution to the grave economic crisis. Later the rise of fascism as a menace to democracy spurred others who feared this form of tyranny to align with the Communist Party.[17] After 1935, that Party advocated a "Popular Front" of "all democratic parties against fascism." Its platform and slogans stressed full employment, racial equality and various other political and economic changes.[18]

During the depression Schware was led to believe that drastic changes needed to be made in the existing economic system. There is nothing in the record, however, which indicates that he ever engaged in any actions to

---

is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

[16] According to figures of the Communist Party it had 14,000 members in 1932, 26,000 in 1934, 41,000 in 1936. W. Z. Foster, From Bryan to Stalin (1937), 303. It has been estimated that more than 700,000 persons in this country have been members of the Communist Party at one time or another between 1919 and 1951. Ernst and Loth, Report on The American Communist (1952), 14.

[17] For the numerous and varied reasons why individuals have joined the Communist Party, see Taylor, Grand Inquest (1955), 155–159; Ernst and Loth, Report on The American Communist (1952); Almond, The Appeals of Communism (1954); Crossman, The God That Failed (1949); Department of Defense, Know Your Communist Enemy: Who Are Communists and Why?, DOD PAM 4-6, Dec. 8, 1955. Many of these reasons are not indicative of bad moral character.

[18] See Moore, The Communist Party of the U. S. A.; An Analysis of a Social Movement, 39 Am. Pol. Sci. Rev. 31, 32–33.

overthrow the Government of the United States or of any State by force or violence, or that he even advocated such actions. Assuming that some members of the Communist Party during the period from 1932 to 1940 had illegal aims and engaged in illegal activities, it cannot automatically be inferred that all members shared their evil purposes or participated in their illegal conduct. As this Court declared in *Wieman* v. *Updegraff*, 344 U. S. 183, 191: "Indiscriminate classification of innocent with knowing activity must fall as an assertion of arbitrary power." Cf. *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123, 136.[19] And finally, there is no suggestion that Schware was affiliated with the Communist Party after 1940—more than 15 years ago. We conclude that his past membership in the Communist Party does not justify an inference that he presently has bad moral character.

The State contends that even though the use of aliases, the arrests, and the membership in the Communist Party would not justify exclusion of petitioner from the New Mexico bar if each stood alone, when all three are combined his exclusion was not unwarranted. We cannot accept this contention. In the light of petitioner's forceful showing of good moral character, the evidence upon which the State relies—the arrests for offenses for which petitioner was neither tried nor convicted, the use of an assumed name many years ago, and membership in the Communist Party during the 1930's—cannot be said to raise substantial doubts about his present good moral character. There is no evidence in the record which

---

[19] And see *Schneiderman* v. *United States*, 320 U. S. 118, 136, where this Court stated:

". . . under our traditions beliefs are personal and not a matter of mere association, and that men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles."

rationally justifies a finding that Schware was morally unfit to practice law.[20]

On the record before us we hold that the State of New Mexico deprived petitioner of due process in denying him the opportunity to qualify for the practice of law. The judgment below is reversed and the case remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE CLARK and MR. JUSTICE HARLAN join, concurring.

Certainly since the time of Edward I, through all the vicissitudes of seven centuries of Anglo-American history, the legal profession has played a role all its own. The bar has not enjoyed prerogatives; it has been entrusted with anxious responsibilities. One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to "life, liberty and property" are in the professional keeping of lawyers. It is a fair characterization of the lawyer's responsibility in our society that he stands "as a shield," to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

---

[20] It must be borne in mind that if petitioner otherwise qualifies for the practice of law and is admitted to the bar, the State has ample means to discipline him for any future misconduct. N. M. Stat. Ann., 1953, §§ 18–1–15 to 18–1–18.

From the thirteenth century to this day, in England the profession itself has determined who should enter it. In the United States the courts exercise ultimate control. But while we have nothing comparable to the Inns of Court, with us too the profession itself, through appropriate committees, has long had a vital interest, as a sifting agency, in determining the fitness, and above all the moral fitness, of those who are certified to be entrusted with the fate of clients. With us too the requisite "moral character" has been the historic unquestioned prerequisite of fitness. Admission to practice in a State and before its courts necessarily belongs to that State. Of course, legislation laying down general conditions of an arbitrary or discriminatory character may, like other legislation, fall afoul of the Fourteenth Amendment. See *Cummings* v. *Missouri,* 4 Wall. 277. A very different question is presented when this Court is asked to review the exercise of judgment in refusing admission to the bar in an individual case, such as we have here.

It is beyond this Court's function to act as overseer of a particular result of the procedure established by a particular State for admission to its bar. No doubt satisfaction of the requirement of moral character involves an exercise of delicate judgment on the part of those who reach a conclusion, having heard and seen the applicant for admission, a judgment of which it may be said as it was of "many honest and sensible judgments" in a different context that it expresses "an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth." *Chicago, B. & Q. R. Co.* v. *Babcock,* 204 U. S. 585, 598. Especially in this realm it is not our business to substitute our judgment for the State's judgment—for it is the State in all the panoply of its powers that is under review when the action of its Supreme Court is under review.

Nor is the division of power between this Court and that of the States in such matters altered by the fact that the judgment here challenged involves the application of a conception like that of "moral character," which has shadowy rather than precise bounds. It cannot be that that conception—moral character—has now been found to be so indefinite, because necessarily implicating what are called subjective factors, that the States may no longer exact it from those who are to carry on "the public profession of the law." (See Elihu Root, in 2 A. B. A. J. 736.) To a wide and deep extent, the law depends upon the disciplined standards of the profession and belief in the integrity of the courts. We cannot fail to accord such confidence to the state process, and we must attribute to its courts the exercise of a fair and not a biased judgment in passing upon the applications of those seeking entry into the profession.

But judicial action, even in an individual case, may have been based on avowed considerations that are inadmissible in that they violate the requirements of due process. Refusal to allow a man to qualify himself for the profession on a wholly arbitrary standard or on a consideration that offends the dictates of reason offends the Due Process Clause. Such is the case here.

Living under hard circumstances, the petitioner, while still in his teens, encountered the confusions and dislocations of the great depression. By one of those chance occurrences that not infrequently determine the action of youth, petitioner joined the Young Communist League toward the end of his high-school days. That association led to membership in the Communist Party, which he retained until the Hitler-Stalin Pact began a disaffection that was completed by his break with the Party in 1940. After 1940, the record of his life, including three years of honorable service in the army, establishes that these early associations, and the outlook they reflected, had

been entirely left behind.* After his war service, three years as a small businessman, and one year at Western Michigan College, petitioner resolved on becoming a lawyer. And so in 1950, at the age of 36, he enrolled in the University of New Mexico Law School and made full disclosure of his early Communist career to its Dean. These are the facts that, taken together with the use of aliases and arrests without conviction or even prosecution, both in his early years, led the Supreme Court of New Mexico, in an original proceeding before it after adverse action by the Board of Bar Examiners, to deny petitioner's application to take the bar examination.

For me, the controlling element in determining whether such denial offended the Due Process Clause is the significance that the New Mexico Supreme Court accorded the early Communist affiliations. In its original opinion and in its opinion on rehearing, the court thus reiterated its legal position:

> "We believe one who has knowingly given his loyalties to such a program and belief for six to seven years during a period of responsible adulthood is a person of questionable character." 60 N. M. 304, 319, 339, 291 P. 2d 607, 617, 630.

Since the New Mexico Supreme Court unequivocally held this to be a factor without which, on a fair reading of its opinion, it would not have denied the application, the conclusion that it drew from all the factors in necessary combination must fall if it drew an unwarranted legal conclusion from petitioner's early Communist affiliation. Not unnaturally the New Mexico Supreme Court evi-

---

*The only bit of evidence that may be adduced to the contrary is a single phrase in a letter to his wife in 1944. To give it an unfavorable and disqualifying significance in the entire context of the letter is to draw so strained a meaning as to be inadmissibly unreasonable.

dently assumed that use of aliases in the pre-1940 period, several unprosecuted arrests, and what it deemed "his present attitude toward those matters," 60 N. M., at 339, 291 P. 2d, at 630 (as drawn from the printed record and not on the basis of having given the petitioner a hearing before the court) precluded denial of his application on these factors alone.

This brings me to the inference that the court drew from petitioner's early, pre-1940 affiliations. To hold, as the court did, that Communist affiliation for six to seven years up to 1940, fifteen years prior to the court's assessment of it, in and of itself made the petitioner "a person of questionable character" is so dogmatic an inference as to be wholly unwarranted. History overwhelmingly establishes that many youths like the petitioner were drawn by the mirage of communism during the depression era, only to have their eyes later opened to reality. Such experiences no doubt may disclose a woolly mind or naive notions regarding the problems of society. But facts of history that we would be arbitrary in rejecting bar the presumption, let alone an irrebuttable presumption, that response to foolish, baseless hopes regarding the betterment of society made those who had entertained them but who later undoubtedly came to their senses and their sense of responsibility "questionable characters." Since the Supreme Court of New Mexico as a matter of law took a contrary view of such a situation in denying petitioner's application, it denied him due process of law.

I therefore concur in the judgment.