304 F.2d 359
 James BOCKMAN, Appellant,
v.
ARKANSAS STATE MEDICAL BOARD, G. D. Murphy, Jr., William A. Snodgrass, Jr., Joe Verser, H. J. Hall, Frank R. Edwards and Earl D. McKelvey, Appellees.
 No. 16986.
 United States Court of Appeals Eighth Circuit.
 June 25, 1962.
 
 James E. Stein and Wayne Jewell, El Dorado, Ark., for appellant.
 Eugene R. Warren, Little Rock, Ark., Bruce T. Bullion, Little Rock, Ark., on the brief, for appellees.
 Before VOGEL, VAN OOSTERHOUT and MATTHES, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 This is an appeal by James Bockman from a decree of the United States District Court for the Eastern District of Arkansas dismissing Bockman's action for a mandatory injunction requiring the Arkansas State Medical Board to reinstate Bockman's license to practice medicine in the State of Arkansas. Appellant asserts a violation of his constitutional rights. He claims that he has not been accorded the equal protection of the law under the Fourteenth Amendment to the Constitution of the United States, in that his license to practice medicine in the State of Arkansas has been revoked by the Arkansas State Medical Board "because of his being of Jewish extraction", "and the fact that he would never turn anybody away from his office who needed treatment because of race, creed or national origin * * *." Appellant asked that the Arkansas State Medical Board be ordered and directed to reinstate his license to practice medicine and that the Board be enjoined from their "systematic persecutions of this Plaintiff because he is a Jew, and further that this Court grant him such judgment to be paid in money that the Court thinks is mete and proper for the loss of his medical practice for two years, his humiliation that he has suffered by the systematic persecution of the Arkansas State Medical Board and such others that have been joined in this conspiracy against him, that would compensate him for his loss and for his costs, and all other and further proper relief that he may be entitled to in law."
 
 
 2
 The appellant received his license to practice from the Arkansas State Eclectic Medical Board in 1922,[1] although he does not appear to have practiced medicine in the State of Arkansas until about 1937, spending the intervening years interning in various hospitals in the East. In 1937, appellant returned to Arkansas and commenced the active practice of medicine in West Helena, Arkansas. That same year a complaint was filed with the State Eclectic Medical Board "asking that Dr. Bockman's license be revoked on the ground that he had been convicted in New York of crimes involving moral turpitude. That board declined to revoke the license, holding that the proof of identity was insufficient and that in any event the offenses did not involve moral turpitude. On certiorari the circuit court refused to disturb the board's findings, and no appeal was taken to this court [the Supreme Court of Arkansas]." Bockman v. Arkansas State Med. Bd., 1958, 229 Ark. 143, 313 S.W.2d 826, 829.
 
 
 3
 In 1955 another complaint was filed, this time with the Arkansas State Medical Board, charging the appellant with having been convicted of crimes involving moral turpitude and also with obtaining his license by fraud. After fruitless attempts to have Dr. Bockman present at hearing set by the Board and insistence on the part of his attorneys that it proceed in his absence, the Board held a hearing and on April 22, 1957, revoked the appellant's license on both of the alleged grounds. An appeal by writ of certiorari was taken to the Circuit Court of Pulaski County and, after affirmation there, to the Supreme Court of Arkansas. The Supreme Court, in Bockman v. Arkansas State Med. Bd., supra, at page 828 of 313 S.W.2d, stated:
 
 
 4
 "For a reason to be explained later we discuss only the charge that the license was obtained by fraud. Dr. Bockman received his license from the Arkansas Eclectic Medical Board in 1922, although he does not appear to have practiced medicine in Arkansas until about 1937. In applying for the license Dr. Bockman stated on oath that he had attended lectures at the Kansas City College of Medicine and Surgery for four years, beginning in 1917, and that he had been granted a diploma by that institution on May 5, 1922."[2]
 
 
 5
 "The records of the Kansas City school were not available, but counsel for the board introduced the affidavits of six physicians who attended the college and graduated in the class of May, 1922. All six state that Dr. Bockman did not attend the school. It was also shown by affidavit that Dr. Bockman did not appear in the class graduation picture, nor was his name listed in the announcement of the commencement exercises. Counsel also introduced certified copies of judicial opinions rendered in Connecticut, in a proceeding which resulted in the revocation of Dr. Bockman's license to practice there, in 1928. In detailed findings of fact the trial court found that Dr. Bockman was not a bona fide graduate of the Kansas City school, having merely paid $30 for the privilege of taking an examination (which no one failed to pass if a suitable fee was paid) and having on that basis been awarded an `honorary' degree. The trial court's decision was affirmed on appeal. Aronson v. State Dept. of Health, 108 Conn. 84, 142 A. 476.
 
 
 6
 "This proof is sufficient to sustain the findings that the license was obtained by means of false representations. Although the evidence consists of affidavits and certified copies of court decisions, it was nevertheless competent. This is not a criminal prosecution, in which the accused is entitled to be confronted by the witnesses against him. It is an administrative proceeding, civil in nature, as to which the governing statute provides: `The Board shall not be bound by strict or technical rules of evidence, but shall consider all evidence fully and fairly, provided, however, that all oral testimony considered by the Board must be under oath.' Ark.Stats. § 72-614. * * * Here the evidence is wholly uncontradicted, as Dr. Bockman did not choose to testify or to offer proof tending to refute the charges against him. We have no doubt that the evidence adduced was admissible in a hearing of this kind and was ample to sustain the findings."
 
 
 7
 While sustaining the action of the Board in finding that appellant had obtained his license by fraud, the Supreme Court of Arkansas considered the second charge — that he had been convicted in New York of crimes involving moral turpitude — subject to the plea of res judicata, it having been shown that such charge was made in 1937 in the prior proceedings and there dismissed. Quoting from pages 829-830 of 313 S.W.2d of the Bockman case:
 
 
 8
 "* * * It is shown that the attorney for the complainant in the 1937 proceedings knew that Dr. Bockman was not a bona fide graduate of the Kansas City medical school, but that fact was not asserted as a ground for the revocation of the license and was not considered by the Eclectic Medical Board. Doubtless the charge of fraudulent procurement of the license might have been joined with the charge of prior criminal convictions, but a joinder was not essential. The two instances of misconduct were entirely distinct, separated in time by a number of years, and had no bearing upon each other. Hence there were two causes of action, and a decision upon the first had no effect upon the second. State Life Ins. Co. v. Goodrum, 189 Ark. 509, 74 S.W.2d 230. Since it was settled by the Beatty case, supra, [Eclectic State Med. Bd. v. Beatty, 1941, 203 Ark. 294, 156 S.W.2d 246] that the practice of medicine under a license fraudulently obtained is a continuing offense, no issue of limitations or laches is now presented.
 
 
 9
 "We conclude that the board was entitled to act upon the first charge in the complaint, but the defense of res judicata to the second count should have been sustained. Upon a finding of guilty the board is authorized to revoke the license, or to suspend it, or to place the person charged upon probation. Ark.Stats. § 72-614. The record does not indicate what penalty would have been imposed had the board considered only the charge that the license was procured by fraud. The cause will therefore be remanded, through the circuit court, to the board, to the end that that body may enter an order based only upon its finding that the license was obtained by false representations."
 
 
 10
 Thereafter the Board held a meeting on July 31, 1958, at which meeting the appellant was present and was also represented by counsel. The result of the hearing was that the Board revoked the appellant's license on the ground that it had been obtained by fraud. At a hearing on November 5, 1959, over a year later, the Board, in considering a petition for rehearing, refused to rescind its order of revocation. These actions of the Board were not appealed, although there are provisions in the law of Arkansas therefor. Ark.Stat.1947 and §§ 72-614, 22-302.
 
 
 11
 This action was commenced on February 17, 1960. The matter was tried to the court. The appellant was present in person and represented by counsel. He testified personally and offered witnesses in his behalf. Testimony was also offered by the appellees. The District Court found that the appellant had failed to sustain his case against the Board and his complaint was dismissed with prejudice. The court made specific findings of fact and conclusions of law, finding, inter alia:
 
 
 12
 "IV.
 
 
 13
 "The evidence offered by plaintiff that he had suffered harassment while practicing medicine in West Helena and West Memphis prior to the Board's action in 1957, was not connected with any action by the State Medical Board. There is no proof that any of these activities alleged to constitute harassment were communicated to the Board members, nor that they had any knowledge of them.
 
 
 14
 "V.
 
 
 15
 "The plaintiff has failed to introduce any evidence that the action of the State Medical Board was in any way influenced because of his religion or that he was in any way discriminated against in any of the proceedings for revocation held by the Board.
 
 
 16
 "VI.
 
 
 17
 "With the exception of Dr. Joe Verser, the members of the State Medical Board who appeared as witnesses were unacquainted with Bockman prior to his appearance before the Board on July 31, 1958. None of the members of the Board knew that Bockman was a Jew until he filed the present action in the United States District Court February 17, 1960. The Court finds that the fact that Bockman was a Jew in no way affected the consideration of the charges against him by the State Medical Board nor their decision to revoke his license.
 
 
 18
 "Conclusions of Law.
 
 
 19
 C>"I.
 
 
 20
 "The Court has jurisdiction of this cause and the parties hereto.
 
 
 21
 "II.
 
 
 22
 "The plaintiff has failed to establish by a preponderance of the evidence any cause of action against the defendant and the complaint should be dismissed with prejudice."
 
 
 23
 In appealing to this court, it is claimed that the District Court erred in failing to admit all of the evidence offered by the appellant in his offer of proof designated herein as a "Brief". We have examined the offer in detail. It is more or less a documented history of the life of James Bockman, beginning with his birth of Jewish parents in New York City, his alleged matriculation in 1917 with the Kansas City College of Medicine and Surgery at Kansas City, Missouri, graduation therefrom, examination by the Arkansas State Eclectic Medical Board and his being licensed to practice in the State of Arkansas in 1922. Skipping over briefly the years between 1922 and 1937, during which time he was in the East, appellant offered, inter alia, proof that he spent 18 months as house physician and surgeon at St. Joseph's Hospital in Paterson, New Jersey, and 6 months as resident obstetrician at the Brooklyn Hebrew Maternity Hospital. Appellant recites that he returned to Arkansas in 1937 and started to practice. Evidence was offered that during World War II Bockman served as Civilian Contract Physician for a period of two years at the prisoner of war camp at West Helena, Arkansas. He further sets out various difficulties that he encountered in his practice, that he was called "negro loving Jew", and other names, but that in spite of the harassments he built up a large clientele of both colored and white patients. He recites other difficulties with reference to malpractice suits, inability to obtain a permit to build a wing on his clinic, harassment by being charged with illegally dispensing narcotics, difficulties with the police department in West Memphis, Arkansas, difficulties in buying drugs, alleging that other doctors threatened to discontinue business with the salesmen who supplied drugs to Bockman, that his signs were being constantly torn down and broken, and vile names shouted at him by people who drove past his clinic.
 
 
 24
 Even if the appellant had been allowed to establish through the voices of witnesses all of the statements alleged or recited in his offer of proof, it would not have sustained the burden which was his, nor would it have tended to sustain the charges against the Board. As Judge Young stated in his Memorandum:
 
 
 25
 "At the trial plaintiff offered evidence that he had been harassed while practicing in Helena and West Memphis (prior to the Board's action in 1957) by various parties, that he had had difficulty in purchasing drugs and that he had been referred to in disparaging terms as a Jew. There is no proof that any of these activities by such parties were communicated to the Board members, nor that they had any knowledge of them — in fact, the Board members who testified specifically denied such knowledge. The court ruled that testimony regarding activities by such third parties not shown to be connected with the Board's action was irrelevant, and therefore inadmissible, but permitted plaintiff to make an appropriate offer of proof of such proposed testimony."
 
 Judge Young further stated:
 
 26
 "The only testimony on the part of plaintiff that in any way contended to corroborate his charges related to two members of the Board, Drs. Verser and Harris.
 
 
 27
 "Bockman testified that he went to see Dr. Verser at his office in Harrisburg, Arkansas, some time in 1953 or 1954 to talk to him about getting a medical license to practice in Arkansas for his brother. Bockman's brother had attended a medical school in Europe. According to Bockman, Dr. Verser told him that he did not want any foreigners in Arkansas, and furthermore became angry and referred to him as a `damn Jew.' Dr. Verser testified that Bockman did come to see him about his brother — that he explained to Dr. Bockman that the Arkansas law did not permit graduates of foreign medical schools to be admitted to practice, and that the interview or conversation between the two was entirely pleasant. Bockman's testimony does not disclose any reason why Dr. Verser should have lost his temper or used violent language, and frankly I am unable to give it credence.
 
 
 28
 "The other Board member referred to in the testimony was Dr. Harris of Newport, Arkansas. A lay witness, Robinson, testified that he went to Dr. Harris' office for treatment some time in 1956 or 1957 and after some conversation between the two Robinson stated that while he had lived in West Memphis that Bockman had been his doctor, and he said further that this appeared to infuriate Dr. Harris, that he used vile language, described Bockman as a Jew, and said words to the effect that `they were going to get rid of him.'
 
 
 29
 "Dr. Harris died in 1957 and we have only Robinson's version of this interview. No plausible reason is given as to why Dr. Harris would have made such statements to a new patient.
 
 
 30
 "Aside from that, Dr. Harris did not participate in any of the Board's meetings that dealt with Bockman's case. As stated before, the record shows that he died in 1957, although the witnesses were unable to disclose the exact date of his death."
 
 
 31
 Herein appellant's counsel rely on Schware v. Board of Bar Examiners of New Mexico, 1957, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796. There is no analogy whatsoever. In Schware, the Board of Bar Examiners of New Mexico refused to permit the petitioner there to take the bar examination on the ground that he had not shown "good moral character" and thereby precluded his admission to the bar of that state. It was conceded that petitioner was qualified in all other respects. Petitioner made a strong showing of good moral character, excepting that it appeared from 1933 to 1937 he had used certain aliases, that he had been arrested on several occasions prior to 1940 (but never tried or convicted), and that from 1932 to 1940 he was a member of the Communist Party. The New Mexico Supreme Court sustained the Board. The Supreme Court of the United States, after considering the contexts out of which the suspect activities arose, reversed, holding that the State of New Mexico had deprived the petitioner of due process in denying him the opportunity to qualify for the practice of law in that it could not reasonably be found from the record that the petitioner there was not of good moral character. If, in the instant case, the Board here had revoked appellant's license because he was Jewish or it could reasonably be found that the Board had done so for that reason, then, of course, Schware would be applicable. In this record, however, there is almost complete absence of anything which would justify the conclusion that any member of the Board was prejudiced against the appellant because he was Jewish or for any reason whatsoever or that the Board acted on such basis. The evidence points in the opposite direction and fully supports the finding of the trial court.
 
 
 32
 Only one member of the Board was acquainted with Bockman prior to the hearings. Each member testified he was unaware of the fact that Bockman was Jewish until the commencement of the instant action. The District Court found specifically that "his [Bockman's] race or religion in no way affected their [the Board's] consideration of the charges against him or their decision to revoke his license." Evidence was received to the effect that in the preceding eleven years many doctors had been investigated, that eight or ten absolute license revocations had been had but that no other Jewish doctor in Arkansas had, to the knowledge of the testifying Board members, been proceeded against in license revocation hearings.
 
 
 33
 Additionally, it appears quite clear from the record and from the statement of the Supreme Court of Arkansas in Bockman, supra, that there was ample evidence to sustain the finding of the Board that Bockman had obtained his license to practice medicine in Arkansas through fraud. As stated by the Supreme Court of Arkansas, the practice of medicine under a license fraudulently obtained is a continuing offense. There presently existed, then, proper and just grounds for the revocation of the license. Accordingly, any additional reasons, pertinent or no, are of indifferent consequence. Appellant would seem to be here seeking to have set aside the revocation on the ground that he is Jewish, in spite of the fact that the record indicates ample grounds for the Board's action.
 
 
 34
 We have considered all of appellant's claims of error and find them to be without any substance whatsoever.
 
 
 35
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Arkansas State Medical Board succeeded to the powers and duties of the State Eclectic Medical Board, the Homeopathic State Medical Board and The State Medical Board of the Arkansas Medical Society in 1955. See Ark.Stat.1947 Ann. § 72-602, as amended
 
 
 [2]
 In Alexander v. United States, 8 Cir., 1938, 95 F.2d 873, certiorari denied 305 U.S. 637, 59 S.Ct. 99, 83 L.Ed. 409, this court affirmed the conviction of several defendants charged with using the mails to defraud in the issuance of fraudulent and fictitious medical and chiropractic diplomas, certificates and licenses from the Eclectic Medical University at Kansas City, Missouri, its successor Kansas City College of Medicine and Surgery, and its successor American Medical University