Valarie Diane ESSER, Plaintiff,

v.

A. H. ROBINS COMPANY, INC., a Virginia corporation, Defendant.

Bonnie J. SOOST, Plaintiff,

v.

A. H. ROBINS COMPANY, INC., a Virginia corporation, Defendant.

Nos. 3–80 Civ. 144, 3–80 Civ. 297.

United States District Court, D. Minnesota, Third Division.

March 26, 1982.

Cloutier & Musech by Thomas J. Bissell, Minneapolis, Minn., for Cortlen G. Cloutier.

Rosso, Beutel, Johnson, Rosso & Ebersold by Steven Rosso, New Brighton, Minn., for plaintiff.

Lindquist & Vennum by Laurance R. Waldoch, Minneapolis, Minn., for A. H. Robins.

### MEMORANDUM ORDER

ALSOP, District Judge.

### PROCEDURAL HISTORY

The above-entitled actions were commenced by the law firm of Cloutier & Musech ("Cloutier firm") on behalf of the respective plaintiffs. On September 29, 1980, defendant A. H. Robins ("Robins") filed a motion to disqualify the Cloutier firm as counsel for plaintiffs. Various discovery was conducted with regard to the disqualification motion, and the matter was argued and submitted to the court on June 3, 1981.

Prior to a decision by the court on the merits of the disqualification motion, the Cloutier firm filed a motion to permit its withdrawal as counsel for the plaintiffs and to substitute Steven T. Rosso ("Rosso") in its place. As part of its motion, the Cloutier firm requested the court to "authorize and direct" Rosso to reimburse the Cloutier firm for services performed and responsibility assumed by the Cloutier firm in connection with the cases. Robins opposed the withdrawal motion, arguing that the court should first rule on the disqualification motion. In the alternative, Robins argued that if the court were to permit the Cloutier firm to withdraw, the withdrawal should be permitted only under terms and conditions similar to those imposed by the court upon the withdrawal of the law firms of Appert & Pyle, Larkin, Hoffman, Daly and Lindgren ("Larkin") and DeParcq, Anderson, Perl, Hunegs & Rudquist ("Perl") in other Dalkon Shield cases. Therefore, the issues now before the court are whether the withdrawal of the Cloutier firm as counsel for plaintiff should be permitted prior to ruling on the disqualification motion and, if so, upon what terms and conditions the withdrawal should be permitted.

## THE PRESENT MOTION'S RELATIONSHIP TO WITHDRAWAL MOTIONS IN OTHER DALKON SHIELD CASES

█ The motion to disqualify the Cloutier firm and its later motion to withdraw as plaintiffs' counsel cannot be viewed in isolation but must be considered in light of the court's earlier decisions regarding similar motions to disqualify Appert & Pyle, Larkin, and Perl. As the court has previously indicated, particularly in its order of October 7, 1981, regarding the withdrawal of Appert & Pyle, the court is of the view that the withdrawal of counsel need not await the court's decision on the merits of the disqualification motion. In practical effect, the withdrawal of counsel would make moot the disqualification motion. Thus, the Cloutier firm should be permitted to withdraw as counsel for plaintiffs, if that be its desire, without the need for the court to decide the disqualification motion brought by Robins.

The remaining issue is what, if any, conditions should be imposed upon the withdrawal by the Cloutier firm. The motion to disqualify the Cloutier firm differs little from the motions previously heard by the court involving Appert & Pyle, Larkin, and Perl in that Robins' motions to disqualify all of the various plaintiffs' counsel were based on counsel's relationship with Willard Browne, a claims adjuster for Aetna Casualty and Surety Company ("Aetna"). Thus, at first blush, there would appear to be no reason to vary in this instance from the conditions imposed upon the withdrawal of the other law firms. Those conditions involved review by the special master of the transferred files, restrictions on communication between the withdrawing and substituting counsel and the withdrawing counsel's affidavit that it will not be involved in any future Dalkon Shield related cases. All are appropriate conditions for the withdrawal of the Cloutier firm as they were for the other law firms which sought to withdraw in other Dalkon Shield cases.

Despite the similarities between the motion now before the court and those related motions previously decided, there are significant factual differences which bear directly on the appropriateness of any fee division. In the cases involving Appert & Pyle, the only previous withdrawal which addressed the issue of fee division, the court approved an arrangement whereby the special master reviewed the division of fees after the resolution of each case to insure that any fee division was in accordance with Disciplinary Rule 2–107 and Ethical Consideration 2–22 of the Code of Professional Responsibility.

In deciding the Appert & Pyle withdrawal motion, the court addressed only the issue of whether the proposed division of fees between Appert & Pyle and substituting counsel was permissible under DR 2–107 and EC 2–22. The court did not reach the issue of whether a withdrawing attorney could be denied a fee for services performed in connection with a case, even though receipt of the fee would not violate DR 2–107 or EC 2–22; and, if so, when such a denial would be appropriate. This second issue was not addressed by the court in the Appert & Pyle matter because there was not sufficient evidence in the record for such a determination to be made. At the time Appert & Pyle's motion to withdraw was heard, there was still lengthy discovery remaining in Robins' motion to disqualify Appert & Pyle. A decision regarding a denial of all fees would have had to await the completion of the remaining discovery. The court determined that it was in the interest of justice to permit the withdrawal of counsel and a fee division in accordance with DR 2–107 and EC 2–22 rather than to require both sides to complete the long discovery process, which would have been extremely costly and would have created yet further delay for the respective plaintiffs.

The instant case presents the court with an entirely different situation. All discovery with regard to the Cloutier disqualification motion is completed. The matter was briefed, argued and under advisement when Cloutier moved the court for permission to withdraw. The record regarding the disqualification motion being complete, the present case is ripe and, in the interest

of justice, requires that the court address the issue of the appropriateness of a complete denial of fees to the Cloutier firm.

## COURT'S AUTHORITY TO REGULATE THE BAR

■ It is well recognized that a federal district court has the inherent authority and responsibility to regulate and supervise the bar practicing before it. *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602 (8th Cir. 1977); *Hull v. Celanese Corp.*, 513 F.2d 568 (2nd Cir. 1975). The court's inherent authority includes the right to inquire into the fee arrangement. *In re Michaelson*, 511 F.2d 882 (9th Cir. 1975), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975). In exercising this authority, district courts are given broad discretion. *Fred Weber, Inc. v. Shell Oil Co., supra.* While the majority of cases involving complaints of attorney misconduct take the form of a motion to disqualify counsel, the court has wide discretion in framing its sanctions, including the assessment of penalties and fines. *In re Morris*, 521 F.2d 794 (9th Cir. 1975); *United States v. Farmer*, 476 F.2d 996 (9th Cir. 1973), *cert. denied*, 419 U.S. 848, 95 S.Ct. 85, 42 L.Ed.2d 79 (1974); *United States v. Carrion*, 475 F.2d 770 (9th Cir. 1973). It is further recognized that in imposing sanctions, the court can do so on motion of another party or on its own motion. *See Empire Linotype School, Inc. v. United States*, 143 F.Supp. 627 (S.D.N.Y. 1956). From the foregoing cases, it is clear that the district court has within its inherent, discretionary authority to regulate the bar the authority to deny fees to any attorney who is guilty of unethical conduct.

## RELATIONSHIP OF CORTLEN CLOUTIER AND THE CLOUTIER FIRM TO WILLARD BROWNE

■ The court must now turn to the issue of whether Cloutier engaged in unethical conduct requiring the denial of any fee. The alleged unethical conduct of Cortlen Cloutier (Cloutier) and the Cloutier firm centers around their relationship with Willard F. Browne, Aetna's senior claims adjuster in charge of Dalkon Shield cases in Minnesota. The court found helpful and accurate the summary of what are essentially undisputed facts regarding the relationship between Cloutier and the Cloutier firm and Browne contained on pages 22 through 30 of the Statement of Points and Authorities of A. H. Robins Company, Inc. in Support of Motion to Disqualify Cortlen Cloutier and the Cloutier Law Firm. The following quotations are excerpts from those pages, which the court herein adopts:

The principal elements of the relationship between the Cloutier firm and Browne are undisputed. Browne worked for the Cloutier firm from approximately 1973 to the present time . . . .

\* \* \*

Both Cloutier and Browne concede that Browne received large sums of money from the Cloutier firm during the period between 1975 and 1979. During his deposition, Cloutier produced hundreds of invoices and checks indicating the specific amounts of payments to Browne between 1973 and the present time. Similarly, the income tax records produced by Browne indicate that he received the following amounts from the Cloutier firm during the period between 1975 and 1979:

1975—$7,490.20 (Browne Dep. Ex. 10)

1976—$13,401.78 (Browne Dep. Ex. 9F)

1977—$42,189.34 (Browne Dep. Ex. 7A)

1978—$31,204.46 (Browne Dep. Ex. 6A)

1979—$48,287.15 (Browne Dep. Ex. 6A)

Cloutier testified that he anticipates that in 1981 Browne will receive approximately $30,000 to $35,000 in compensation from the Cloutier firm. Cloutier states that this figure depended upon the extent to which Browne wishes to work and that he could make $50,000 from the Cloutier firm in 1981 if he decides to put in that much time (Cloutier Dep., p. 64–65).

Cloutier indicated that Browne worked only with him personally, although he was compensated by the Cloutier firm. Cloutier's relationship with Browne was first one of friendship followed by the working relationship (Cloutier Dep., p. 26). The work

conducted for Cloutier by Browne involved such matters as the review of medical files, the determination of various additional steps to be taken in connection with the cases, the gathering of additional materials and evidence and the evaluation of settlement values of cases. (Cloutier Dep., p. 43).

In addition to his work on particular cases, Browne also assisted Cloutier in the management of the law firm. Cloutier testified that he used Browne in connection with such matters as personnel situations, salary administration and related matters. Browne had access to the financial records of the firm regarding such matters as cash flow, payables, lease expenses and other such matters. He was involved in the merger of the Columbia Heights office with the downtown office of the Cloutier firm. (Cloutier Dep., pp. 74–75).

\* \* \*

In a deposition taken on March 21, 1979 in the case of *Greg M. Corwin v. Cloutier, Musech, Berde, Corwin & Dobis and Cortlen J. Cloutier, Individually*, Hennepin County District Court, Fourth Judicial District, File No. 746004, Cloutier testified that during 1977, Browne was in the Cloutier office "... four days a week, five days a week and sometimes Saturdays occasionally." He stated that "... if you counted Saturdays and Sundays he was probably in our office five or six days a week. It was rare when he would not be in our office for some period of time." (Cloutier Dep., Corwin Case, p. 43).

\* \* \*

While Cloutier denies that Browne did any work on Dalkon Shield cases for the Cloutier firm while he was still employed by Aetna (Cloutier Dep., p. 23) it is undisputed that Cloutier "negotiated" at least three Dalkon Shield cases with Browne while Browne was purportedly representing Aetna and Robins. It is also undisputed that Browne worked on and was compensated for working on several Dalkon Shield cases for Cloutier after he had been terminated by Aetna.

The deposition of Michael L. Berde, an attorney who had been associated with the Cloutier firm, also taken in the Corwin case, sheds additional light on the nature of the relationship between Browne and the Cloutier firm. He testified, for example, that Browne attended a meeting of the partners of the firm to determine whether or not to admit a new partner into the firm. (Berde Deposition, p. 48.) Berde further testified that office space had been provided to Browne and that while at first Browne didn't have a private office, he had a place to work in the Cloutier offices (Berde Deposition, p. 51).

\* \* \*

Mr. Berde further testified as follows with respect to a large personal injury case in California which the firm settled in 1977. A dispute apparently developed during a discussion between Cloutier, Browne and Berde with respect to the relative share of the fee that each person should receive for work done on the case. Berde testified as follows with respect to this matter:

"... I came back to Mr. Cloutier, and I said that I didn't see why I should have to negotiate this with Mr. Browne since he wasn't a partner in this firm, and I didn't think he had any business participating in that discussion, and *Mr. Cloutier became angry and said well, he, Mr. Cloutier, considered Mr. Browne a partner, and I was very surprised at that statement but that's what was said,* and Mr. Cloutier and I subsequently negotiated a figure which I did not then believe was just, but I didn't want to carry on the controversy any longer.

\* \* \*

Cloutier testified that he asked Browne to review and evaluate both the *Esser* case and the *Soost* case as well as various other Dalkon Shield cases which were pending after Browne's termination at Aetna.... Cloutier further testified that with respect to the Dalkon Shield cases still pending, it is possible that Browne may have further involvement in such cases. (Cloutier Dep., p. 43.) The records submitted by Cloutier indicate that Browne worked on the following Dalkon Shield cases for Cloutier after

Browne's termination by Aetna and received the following amounts of compensation in connection with such cases:

| Claimant | Compensation | Date of Services |
|---|---|---|
| Esser | $558.21 | Feb. 12, 1980 – May 20, 1980 (Cloutier Ex. 7) |
| Soost | $767.47 | Dec. 27, 1979 – May 2, 1980 (Cloutier Ex. 8) |
| Hubbard | $796.30 | Dec. 19, 1979 – Mar. 18, 1980 (Cloutier Ex. 2) |
| Frederichs | $ 65.00 | Dec. 10, 1979 – Apr. 22, 1980 (Cloutier Ex. 4) |
| Johannsen | $ 85.00 | Feb. 18, 1980 – Apr. 22, 1980 (Cloutier Ex. 4) |
| Talamenter | $528.13 | Jan. 29, 1980 – Apr. 15, 1980 (Cloutier Ex. 3) |

With respect to the Sullivan case which has been discussed extensively above, Cloutier testified that he did not disclose to anyone at Aetna or Robins that he was "negotiating" with Browne on a case while at the same time employing Browne on the conditions described herein. (Cloutier Dep., pp. 59 and 61.) Cloutier expressed the view that it was his understanding that Browne had notified Aetna officials of his work with Cloutier but no claim is made that Browne or Cloutier had notified Robins.

The testimony of Mr. Berde in his deposition in the Corwin case is particularly significant in connection with the issue of whether Cloutier and Browne were in fact negotiating at arms length in connection with the Sullivan case and the other Dalkon Shield cases which were settled by the Cloutier office prior to Browne's termination by Aetna. With respect to the question of whether Browne worked directly on Dalkon Shield files, Berde testified as follows:

"I never saw him directly working on the files, and it was never told to me that he was working on the files, so to that extent I can't say with complete assurance that he did, but *Mr. Cloutier and Mr. Browne both mentioned to me that it would be nice if I could get some Dalkon Shield cases into the office.*

Q. If who could?

A. If I could, anybody associated with this office.

Q. Why?

A. *Because they were then, I believe, being settled by the insurance carrier, and there was money to be made in bringing a Dalkon Shield case into the office."* (Berde Deposition, p. 88.)

Since approximately December of 1977, Browne has been driving a 1978 Cadillac which is owned by the Cloutier law firm. Browne has used the car both for business and personal purposes. He has paid the Cloutier firm $75.00 a month for his personal use of the car.

### THE APPROPRIATENESS OF SANCTIONS

Attorneys before this court are required "to demean (themselves) uprightly and according to the law and the recognized standards of ethics of the profession." United States District Court for the District of Minnesota, Local Rule No. 1(C).

It is a fair characterization of the lawyers responsibility in our society that he stands ... in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

*Schware v. Board of Bar Examiners*, 353 U.S. 232, 247, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring).

Our system of justice is not self-applying; it takes individuals specially skilled and trained in fashioning and presenting legal arguments. Since the average person is incapable of knowing the principles of law and the rules of legal procedure, society has entrusted the legal profession with the unique privilege of representing the rights of others and in applying the judicial machinery to individual cases. With this unique privilege comes the uncompromisable responsibility for lawyers to conduct themselves in such a manner so as to maintain the integrity of and public confidence

in the legal system. The success of our system of justice requires that people have faith that justice can be obtained. "Public confidence in law and lawyers may be eroded by irresponsible or improper conduct of a lawyer." Ethical Consideration 9–2.

There can be no question that Cortlen Cloutier has, through his relationship with Browne, breached the trust and confidence bestowed upon him as a member of the bar. Mr. Cloutier's conduct is also a clear violation of the Code of Professional Responsibility. Particularly applicable here are Cannons 1 and 9 which provide:

Cannon 1:

A lawyer should assist in maintaining the integrity and competence of the legal profession.

Cannon 9:

A lawyer should avoid even the appearance of professional impropriety.

For the court to permit Cloutier to now profit financially in view of his violations of the ethical code of the profession would be to make a mockery of the ethical standards that have been violated and further impair the integrity of and the public confidence in the legal system.

If, within 20 days from the filing of this order, Cloutier and the Cloutier firm have not consented to withdraw under the terms and conditions set forth herein, the court shall forthwith issue its order on the disqualification motion.

Upon the foregoing,

IT IS ORDERED That the motion of Cortlen Cloutier and the Cloutier firm to withdraw as plaintiffs' counsel in the above-entitled cases shall be granted upon the following terms and conditions:

1. Each file shall be made available to Special Master Walter Rogosheske who shall review each file to determine whether any inappropriate or improper materials, including but not limited to materials originating from Mr. Willard Browne, are contained therein. Any such materials shall be removed from the file before transfer to the substituted counsel and shall be brought to the attention of the court for appropriate disposition. After the Special Master is satisfied that the file contains no inappropriate or improper materials, the file shall be transferred to the custody of the substituted counsel.

2. Upon transfer of a file, the Cloutier firm's responsibility for the file shall terminate. A substitution of counsel shall be filed, and the Cloutier firm shall have no further involvement, direct or indirect, in the handling of the file.

3. Any communication between the Cloutier firm and substituted counsel with regard to any transferred file or any Dalkon Shield related topic shall, whenever possible, be in writing with a copy to the Special Master. If oral communication is necessary, it shall be within the hearing of the Special Master.

4. The initial retainer agreement executed by the above-named plaintiffs with the Cloutier firm shall be accepted and assumed by substituted counsel. There shall be no increased legal fees to clients as a result of any substitution.

5. The Cloutier firm shall in no way, either directly or indirectly, receive any financial remuneration for the transfer of these cases to substituted counsel, nor receive a division of any fee generated by a resolution of any of the claims, including payment for any work done or responsibilities assumed by the Cloutier firm prior to transfer of the cases.

6. The Cloutier firm shall take all necessary actions to assure that each client's interests are protected in the transition of the files involved.

IT IS FURTHER ORDERED That if within 20 days from the filing of this order, there is compliance with the conditions above set forth and the filing of the consent of substituted counsel to be bound thereby, in any action designated, this court will grant Cloutier's motion to permit its withdrawal as counsel for plaintiffs and issue its further order approving the substitution of counsel in such action.

IT IS FURTHER ORDERED That upon this court's consent to the substitution of

counsel in both of the above-entitled actions and upon receipt by this court of an affidavit from Cortlen Cloutier and the Cloutier firm stating they shall have no involvement with any future Dalkon Shield cases, this court will issue its further order dismissing the motion of the defendant A. H. Robins Company to disqualify Cortlen Cloutier and the Cloutier firm; such dismissals being made not upon the merits but upon the grounds that the motions have become moot.

IT IS FURTHER ORDERED That all expenses arising from the services to be rendered by the Special Master in monitoring the withdrawal of the Cloutier firm under the terms of this order shall be paid by the Cloutier firm.

IT IS FINALLY ORDERED That no substituted counsel shall be disqualified solely because of the transfer of the above-mentioned cases pursuant to this order.