Arthur Lee **HARRIS**, Sr., et al.

v.

**LOUISIANA STATE SUPREME COURT et al.**

**Civ. A. No. 70-3227.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Nov. 3, 1971.

Etta Kay Hearn, Wilfret R. McKee, Baton Rouge, La., Edward Larvadain, Jr., Alexandria, La., Margrett Ford, Shreveport, La., Milton Osborne, Jr., Plaquemine, La., Joseph V. Hawkins, Baton Rouge, La., for plaintiffs.

John E. Jackson, Jr., Dorothy D. Wolbrette, New Orleans, La., Jack P. F. Gremillion, Atty. Gen. of La., Baton Rouge, La., for Louisiana Supreme Court.

M. Truman Woodward, Jr., Thomas O. Collins, Jr., New Orleans, La., for Louisiana State Bar Association.

Thomas B. Lemann, Leon Sarpy, New Orleans, La., for Louisiana State Law Institute.

Before AINSWORTH, Circuit Judge, and BOYLE and CASSIBRY, District Judges.

BOYLE, District Judge:

This matter came on for hearing before this statutory Court on motions of the various defendants. The Court took time to consider.

Plaintiffs Arthur Harris, Hickman, Dumas, Huckaby, Richard, and Rodney Williams are alleged to be black graduates of the Southern University School of Law (hereinafter SU), which is alleged to be a predominantly black institution. Plaintiffs Hearn, McKee, Hawkins, and Osborne are black graduates of the Southern School of Law, and were admitted to practice and became members of the Louisiana State Bar Association (hereinafter LSBA).[1] Plaintiffs Aaron Harris, Mouton, Scott, Jones, and Marshall are senior law students at Southern University School of Law. Additional plaintiffs are alleged to be "All other black graduates and potential graduates of Southern University School of Law, a predominantly black institution, who have taken the Louisiana Bar Examination and those who in the future will take said examination as it presently exists."

Named as defendants are the Louisiana Supreme Court (erroneously denominated the "Louisiana State Supreme Court"), the LSBA, its Board of Governors, its Committee on Bar Admissions, its Bar Admissions Advisory Committee, and the Louisiana Law Institute,

---

1. According to their testimonies on depositions, Joseph Hawkins graduated from SU on May 26, 1969, and took the bar examination in July, 1969 (failed) and March, 1970 (passed); Etta Kay Hearn graduated from SU in May, 1969, and took the bar examination in July, 1969 (conditional) and March, 1970 (passed); Milton Osborne graduated from SU in June, 1970, and took the bar examination in July, 1970 (passed), and Wilfret McKee graduated from SU in June, 1969, and took the bar examination in July, 1969 (conditional) and March, 1970 (passed).

incorrectly characterized in the complaint as an all-white organization.[2]

Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1343(1), (2), (3), (4), 2201, 2202, 2281, and 2284, 42 U.S.C. §§ 1981, 1983, 1984, 1985, 1986, and the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States. At the hearing, counsel for the plaintiffs emphasized that the crucial claim was under the equal protection clause of the Fourteenth Amendment.

The complaint alleges three causes of action. In their first cause of action, plaintiffs claim that the Articles of Incorporation of the LSBA, particularly Article 6, § 4, Article 7, § 1, and Article 12, §§ 1–11, have subjected plaintiffs to deprivation of due process and equal protection of the laws. Plaintiffs aver that this alleged "statute" is unconstitutional on its face in that it has deprived faculty and graduates of Southern University's School of Law of participation on certain LSBA Committees and on all committees concerned with the Bar Examination. Plaintiffs allege further that the sole purpose of this "statute," and its only intention and effect, is to (a) deprive the black community

of the competent, fair, and needed assistance of black attorneys; (b) "to control the number of black lawyers who are graduating from SU and coming into the practice of law;" (c) to destroy the image of any graduate of SU by "discriminately grading their papers unfairly by all white examiners," and (d) to limit the number of black students who would otherwise pursue the study of law at said institution and thus destroy the vehicle which would produce more black lawyers than all of the other law schools in this state combined.

As a second cause of action, plaintiffs reallege the unconstitutionality, facially and as applied, of "the Act" and allege further that the Articles of Incorporation of the Louisiana State Bar Association have been used to deny to Southern and its graduates the benefits of representation on certain strategic committees of the Bar Association.

As a third cause of action, plaintiffs allege that the Louisiana Law Institute, under color of La.R.S. 24, §§ 201–208, entered into a scheme, plan or practice to systematically exclude SU, its students and faculty from representation and participation in said Institute in violation of equal protection and due process under the Fourteenth Amendment.[3]

2. Counsel for the Law Institute stated at the hearing on these motions that to his knowledge there are at least two black members of the council of the Louisiana Law Institute, Judge Israel Augustine and Judge Ernest N. Morial.

3. Chapter 4 of Title 24, La. Revised Statutes, pertaining generally to legislature and laws, provides for the creation and functioning of the Louisiana Law Institute. Section 201 creates the Institute as "an official advisory law revision commission, law reform agency and legal research agency of the State of Louisiana." Although the plaintiffs seek to declare the entire Chapter on the Institute unconstitutional, their quarrel is in reality with Section 202, which creates a Council as the Institute's governing body and provides for its membership, terms, and vacancies. Section 202 names as three of the authorized members of the governing body of the Institute, the deans of the Schools of Law of Louisiana State

University, Loyola University and Tulane University; further, subpart B provides that the Council's elected membership shall include three members to be elected from the members of the faculty of the L.S.U. Law School, three from the Loyola Law School faculty, and three from the Tulane School of Law faculty. Section 204 provides for the general purposes and duties of the Law Institute. Among these general purposes and duties we do not find any functions which relate directly to the administration or preparation of the bar examination. Section 205 refers to transmission of reports to the Legislature, and Sections 206–208 refer to a planned "Projet of a Constitution for the State of Louisiana" to be prepared by the Institute under Act No. 52 of 1946. None of these articles concerns bar admissions. However, it may be noted that Section 206, enacted in 1954, provides that copies of the explanatory statements and notes accompanying the Projet are to be delivered

Finally, in a section of the complaint entitled "Damages," it is alleged that those plaintiffs who have taken the bar examination unsuccessfully one or more times under the system as it presently exists are entitled to damages in the amount of One Million Dollars for embarrassment, mental anguish, hardship and alleged economic losses.

Plaintiffs allege further that the defendants' actions have caused them irreparable injury.

Plaintiffs pray for the following relief:

1. That a three-judge court be impaneled;

2. That a declaratory judgment issue declaring unconstitutional the Articles of Incorporation of the LSBA Article 6, § 4, Article 7, § 1, and Article 12, §§ 1–11;

3. That the LSBA be enjoined from making, preparing, and administering the Louisiana State Bar Examination under the present system;

4. That costs be taxed to the defendants;

5. That all SU graduates who have taken the bar (sic) (examination) and failed, be admitted to practice forthwith in the State of Louisiana;

6. That La.R.S. 24:201–208 be declared unconstitutional;[4]

7. That damages in the amount of One Million Dollars be awarded plaintiffs, and for such other relief as may be just.

In an amended complaint, filed November 20, 1970, plaintiffs added to their jurisdictional allegation that the suit is on their own behalf and on behalf of all other black individuals who have taken or who will take the Louisiana Bar Examination as regulated by the existing Articles of Incorporation of the LSBA.

## STRUCTURE AND FUNCTIONS OF THE LOUISIANA STATE BAR ASSOCIATION

According to its organizational statement, the Louisiana State Bar Association was organized by notarial act on March 15, 1941, before Cuthbert S. Baldwin, Notary Public in the Parish of Orleans, "by virtue and in furtherance of an order rendered by the Supreme Court of Louisiana on August 22, 1940, in the matter of the creation of the Louisiana State Bar Association, as amended by an order dated October 1, 1940, and further amended and supplemented by order dated October 17, 1940, appointing an Advisory Committee to the Supreme Court of Louisiana, who assisted in the creation of the Louisiana State Bar Association, and pursuant to a further order of the Supreme Court of Louisiana dated March 12, 1941, wherein the Supreme Court of Louisiana, acting pursuant to a memorial to it addressed by the Legislature in Act 54 of 1940, created the organization and agency of the Supreme Court known as the Louisiana State Bar Association and chartered as a non-trading corporation under the laws of the State of Louisiana, as is provided in the order. The Association was organized in pursuance of said order and under the provisions of Act 254 of 1914."[5]

to the law libraries of L.S.U., L.S.U.N.O., Southern University, Tulane and Loyola. The section under attack, Section 202, was enacted before Southern University School of Law had come into existence. The parties have stipulated that SU's law school was begun in 1947.

While this matter was under submission the Louisiana legislature passed Senate Bill 202 which became Act 161 of the 1971 Regular Session when signed by the Governor of Louisiana on June 14, 1971. This Act affords membership on the Institute's Council to the Dean of Southern University Law School, and § 202(B) grants membership on the Council to three members of the faculty of Southern University Law School, thus providing legislatively the relief sought by plaintiffs in that area.

The plaintiffs have voluntarily dismissed their suit against this defendant.

4. See Footnote 3, supra.

5. See, 21A LSA Rev.Stat. 121.

The Supreme Court's order, signed March 12, 1941, provides that the LSBA was "organized under the rule-making power of the Court. The rules and regulations which shall govern it as an agency of the Court are \* \* \* the articles of incorporation \* \* \*. The Court hereby adopts and promulgates the articles \* \* \* as rules of this Court." [6]

The Articles under attack by the present plaintiffs are Article VI, § 4, Article VII, § 1, and Article XII, §§ 1-11.

Article VI, § 4, concerns the duties of the committee which nominates officers of the LSBA. The section provides that the Committee shall meet with the Board of Governors and shall nominate a President, a Vice-President, a Secretary-Treasurer, a member of the Board to be elected from the Council of the Louisiana Law Institute and three members of the Board to be elected from the faculties of the Board to be elected from the faculties of the Louisiana Law Schools that belong to the Association of American Law Schools (hereinafter AALS), and report such nominations to the Board of Governors. Nominations may also be made by written petition, signed by not less than twenty-five active members in good standing, addressed to the Board of Governors. This section in effect excludes Southern University's School of Law, because the school is not accredited by the AALS.[7]

Article VII, § 1 provides that the Board of Governors is vested with the administration of such of the affairs of the LSBA as are granted to it in the Articles or may be directed to it by the House of Delegates. The Board consists of the officers, the outgoing President, and, inter alia, three faculty members to be elected by the membership of the LSBA at large from the faculties of the Louisiana Law Schools accredited by the AALS.

It must be noted that there is no provision that precludes SU graduates who are members in good standing of the LSBA from participating as electors or candidates in any LSBA elections. SU's exclusion from Law School faculty positions on the Board of Governors is not based on the fact that SU is a predominantly black institution, but on the fact that it is not an accredited law school under the standards of the AALS.

Plaintiffs attack the constitutionality of Article XII *in toto*. Article XII creates two separate committees whose duties relate to bar admissions. Section 1 sets out the composition of the Committee on Bar Admissions. These members are appointed by the Supreme Court on the recommendation of the Board of Governors of the LSBA. There is no portion of this section excluding Southern's representation or granting representation to other law schools. On oral argument, counsel for the plaintiffs maintained that the constitutional attack on this section lies in the fact that to his knowledge the Supreme Court has never appointed a black attorney to this committee. There is an affidavit in the record by Thomas O. Collins, Executive Counsel to the LSBA since January 1, 1965, stating that in the past five years no black attorney has applied for a position on committees.

Collins estimated that there are approximately 80 black members of the LSBA out of a total membership of 6000. The evidence shows that the only black committee members were the Hon. Ernest Morial and Revius Ortique, but no evidence was offered to show that the absence of blacks on committees was the result of racial discrimination.

The duties of the Committee on Bar Admissions are set out in Section 2. This Committee inquires into the general qualifications of all applicants for admission to the Bar, and holds regular written examinations at least twice a year, as designated by the Board of Governors, on such legal subjects as shall

6. See, 21A LSA Rev.Stat. 122.

7. No evidence was adduced to show that SU was not accredited by the A.A.L.S., but the plaintiffs do not contend that SU was so accredited and was nonetheless deprived of membership on the Bar Advisory Committee.

be prescribed by the Board with the approval of the Supreme Court. The Committee reports in writing to the Board the names of all applicants which it finds are qualified to practice law in this State and certifies the names of such applicants to the Supreme Court. The successful applicants are then formally introduced to the Supreme Court, and, without further examination, are sworn in by the Court as attorneys and counselors at law of the State, provided the applicant has reached the age of majority.

Section 3 provides that subject to the approval of the Supreme Court and the provisions of Section 7, the Committee on Bar Admissions shall adopt, to govern the examinations, whatever rules and regulations it may deem expedient, including when and where the examinations will be held and their duration.

Sections 4 through 6 concern a separate body, the Bar Admissions Advisory Committee. Under Section 4, this Committee is composed of one fulltime faculty member from each Louisiana law school that belongs, at the time the faculty member is appointed, to the AALS, and such appointment shall be made on the recommendation of the President of each University having such law school. Section 5 merely provides for a method by which the Committee's chairman is chosen. Section 6 sets out the duties of the Advisory Committee. The Advisory Committee exists to counsel and assist the Committee on Bar Admissions in the performance of its function, and to perform such services in connection therewith as the latter Committee may direct, short of the preparation or grading of examination problems. To this end, it shall meet with the Committee on Bar Admissions at a session which shall be convened by the Chairman of the latter Committee at least thirty days prior to each bar examination, and at such other times as the latter may designate. It is also the duty of the Advisory Committee to submit to the Committee on Bar Admissions within sixty days following each examination,

a written report on the examination and related matter, evaluating it and them in terms of recognized legal educational and bar examination practices. Copies of this report are to be sent to the Chief Justice and the Associate Justices of the Supreme Court of Louisiana and to the Board of Governors of the LSBA.

The requisites for admission to practice in this State, subject to change by the Board of Governors of the LSBA with the approval of the Supreme Court, are set out in Section 7 as follows:

A. At least 45 days prior to the examination date, each applicant must deliver to the Secretary of the LSBA an application addressed to the Committee on Bar Admissions on the required form, accompanied by a fee of ten dollars, and, if the applicant is subject to examination, accompanied by an additional examination fee of fifteen dollars. The application shall be prepared by the applicant, in his own handwriting, and shall be sworn to by him before an officer authorized to administer oaths.

B. Each applicant must produce satisfactory evidence that he is:

(a) of good moral character

(b) twenty-one years of age

(c) a citizen of the United States of America

(d) a graduate of a law school that is approved by the American Bar Association.

C. Each applicant must be certified to the Supreme Court by the Committee on Bar Admissions as having satisfactorily passed the required examinations.

Section 8 provides that the Committee on Bar Admissions shall provide application forms for bar examination applicants, including a special form for graduates of approved law schools in Louisiana, which requires certification of the fact of graduation by the dean of the law school. All applications and certificates, when properly completed and received, shall be referred by the Secretary of the LSBA to the Committee

on Bar Admissions and be retained by it.

Section 9 sets out matters concerning applicants who have been licensed to practice in other states.

Section 10 provides that an applicant failing to pass his first examination shall be permitted to take a re-examination at the next regular examination of the Committee on Bar Admissions. However, should any such applicant fail to pass such re-examination, he shall not be again examined by the Committee until the second regular examination following the examination at which he failed, provided, however, that this restriction shall not apply to applicants who are in active service of the United States in connection with the National Defense, or who will, within six months, following the date of such regular examination, be called to or will enter such active service. Plaintiffs made no argument concerning this latter provision.

Section 11 requires a twenty-five dollar fee for each examination payable to the LSBA. Plaintiffs made no argument asserting that this provision is unconstitutional.

## I. MOTIONS OF DEFENDANTS TO DISMISS FOR LACK OF JURISDICTION

 The plaintiffs have brought this action under 42 U.S.C. § 1983, for injunctive relief and damages. That statute authorizes suit in federal district court, without requiring exhaustion of state judicial or administrative remedies.

Traditionally, matters concerning admissions to the bar and disbarment are left to state regulation and, more specifically, to regulation by the highest state court.[8] Likewise, the responsibility for the choice of persons who will be admitted to the practice of law in a particular state is a matter of state discretion subject, always, to the due process and equal protection clauses of the Constitution of the United States.[9] Thus, in challenging certain portions of the LSBA's Articles of Incorporation on equal protection grounds, plaintiffs have asserted a claim within federal jurisdiction. As the Ninth Circuit stated in Chaney v. The State Bar of California, 9th Cir., 386 F.2d 962 (1967), "The extent to which federal concern is entitled to exist as to the right to be admitted to the practice of law in a State has been stated by the Supreme Court as follows in Schware v. Board of Bar Examiners of State of New Mexico, 353 U.S. 232, 238–239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957):

'A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. * * * A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. * * * Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory.' "

Thus, the range within which this Court entertains jurisdiction is clearly defined by the Supreme Court, and this cause falls within that range.

The Court notes that the affidavit of Mr. Collins, Executive Counsel to the

---

8. Schware v. Bd. of Bar Examiners of the State of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Moity v. La. State Bar Assn., 239 La. 1081, 121 So.2d 87 (1960); Ex Parte Steckler, 179 La. 410, 154 So. 41 (1934); Hackin v. Lockwood, 361 F.2d 499 (9th Cir. 1966).

9. Schware v. Bd. of Bar Examiners of the State of New Mexico, supra; Baird v. State Bar of Ariz., 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); In re Summers, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945).

LSBA stands uncontroverted, and that this evidence shows that during his tenure no requests have been made by black attorneys concerning committee assignments and memberships. We note further that one black candidate, Ernest Morial, was successful in his candidacy for an elective position in the Bar Association, while counsel for the plaintiff mentioned in oral argument that he knew of, but could not name, two unsuccessful black candidates.

The failure of black attorneys to seek involvement in the processes of the LSBA is certainly regrettable; however, in a Civil Rights Action, the plaintiff is not required to show exhaustion of state or administrative remedies.

## II. THE ABSTENTION ISSUE

■ Since, as we have noted, the matters of admissions to the bar and disbarments are regularly and traditionally subject to regulation by the highest court of the state, these plaintiffs could have sought redress by filing suit in the Louisiana courts and, by having raised proper constitutional issues, sought certiorari in the Supreme Court of the United States. This was, indeed, the course of litigation in the most recent Supreme Court cases relating to bar admissions.[10] This Court, having found jurisdiction under the Civil Rights Act, is now asked by the defendants to abstain, that is, to decline to take jurisdiction pending a state suit, appealable to the United States Supreme Court. Defendants urge that considerations of comity are compelling here since plaintiffs in this action have never accorded the Louisiana Supreme Court or the LSBA the opportunity to respond to plaintiffs' complaints through their own procedures.

■ Counsel for the LSBA has stated in his brief that comity and true federalism require that the federal judiciary refrain from interference with the inherent and autonomous regulatory powers of the state judiciary "of which the State Bar Association is merely a ministerial adjunct." Abstention is discretionary with the Court and, considering the nature of this suit, we decline to abstain. Abstention is rooted in comity between and among the courts of the United States and of the several states. However, here, the plaintiffs have alleged deprivation of equal protection rights guaranteed under the Fourteenth Amendment, and have presented allegations which, if proved to be true, would require swift remedial action. This court is well aware that justice delayed is often justice denied, and adopts the reasoning of the Supreme Court in County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959) in which the Court stated:

"The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the *duty* of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest. * * * This Court has sanctioned a federal court's postponement of the exercise of its jurisdiction in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law (cases cited) * * *. This Court has also upheld an abstention on grounds of comity with the States when the exercise of jurisdiction by the Federal court would disrupt a state administrative process, * * * or otherwise create needless friction by

10. Law Students Civil Rights Research Council, Inc. v. Wadmond, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971); In re Stolar, 401 U.S. 23, 91 S.Ct. 713, 21 L.Ed.2d 657 (1971); Baird v. State Bar of Arizona, supra, at note 7; see also Moity v. La. S. B. A., supra.

unnecessarily enjoining state officials from executing domestic policies (cases cited."

As Judge Goldberg of the Fifth Circuit stated in Hobbs v. Thompson et al., 448 F.2d 456 (5th Cir. 1971), "* * * every constitutional right under every circumstance is not to be put on ice awaiting the hearing of the anvils of state adjudication." (448 F.2d p. 462)

We find in the instant case no policy sufficient to warrant our abstention from determination of the core constitutional question of equal protection, and, therefore, decline to abstain from deciding the issues properly before this Court.

### III. MOTION OF DEFENDANTS TO DISSOLVE THREE-JUDGE COURT

All defendants have attacked the jurisdiction of this statutory three-judge court, asserting that since the provisions under. attack are Articles of Incorporation rather than a statute, *per se,* this presents an issue for a one-judge court. Since Act 54 of 1940 was merely a memorializing statute, its constitutionality has not been drawn into question; however, the Articles of Incorporation were the directly mandated result of that legislative act. Were we to consider the Articles merely as an administrative act, this Court would have jurisdiction, for a three-judge statutory court is required to be convened when an attack is made on the constitutionality of an administrative order of general application, representing considered State policy.[11] Since the order of the Supreme Court and its implementation through the Articles of Incorporation represent a state policy of general application, this statutory court

has jurisdiction over the issues raised in the complaint.[12]

Movers contend that the Articles of Incorporation are "insulated" from the original statute by remoteness. However, we find the reasoning of the three-judge district court in New York in Law Students Civil Rights Research Council, Inc. et als. v. Wadmond,[13] to be persuasive here. Circuit Judge Friendly, speaking for the Court, noted the difference between an attack on the order · of an administrator as such and on the statute as applied by him, and found a perceptible difference between a challenge to a governor's "single unique exercise" of power under a statute of unquestioned validity empowering him generally to call out the national guard in case of war or "any forcible obstructing of the execution of the laws or reasonable apprehension thereof, and at all other times he may deem necessary," and the continuing administrative implementation of the statute itself under attack which is constitutional if applied in one way and unconstitutional if applied in another. That is, if the administrator is interpreting legislative policy, even a local application requires three judges; if he is making policy under a delegation, his local action can be tested by a single judge. The Court further noted that the effect of admission to the bar or denial thereof is state-wide.

Although we find the foregoing authority amply sustains this Court's jurisdiction, we have noted the pragmatic statement that, "Although a single district judge is without power to act in a case requiring three judges, the opposite is not true."[14] Thus, should one or

---

11. Hatfield v. Bailleaux, 290 F.2d 632 (9th Cir. 1961), cert. den. 386 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59; see also, Ala. Pub. Serv. Comm. v. So. Rwy. Co., 341 U.S. 341, 343, note 3, 71 S.Ct. 762, 95 L.Ed. 1002; Okla. Natl. Gas. Co. v. Russell, 261 U.S. 290, 292, 43 S.Ct. 353, 67 L.Ed. 659 (1923).

12. 28 U.S.C. § 2281.

13. 299 F.Supp. 117 (S.D.N.Y.1969), affd. 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971).

14. Swift & Co. v. Wickham, 230 F.Supp. 398, 410 (S.D.N.Y.1964), appeal dismissed for want of jurisdiction, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), affd. 364 F.2d 241 (2d Cir. 1966), cert. den. 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967); Law Students Civil Rights Research Coun., Inc. v. Wadmond, supra; Socialist Workers Party v. Rockefeller, 314 F.Supp. 984, 996 (S.D. N.Y.1970).

more matters in this lawsuit be properly triable before a single-judge district court, "sound policy calls for the three-judges to decide that also, since a return of the issue to a single judge would result in an invalid order if the return was erroneous, whereas the only consequence of erroneous retention of jurisdiction by the three-judge court is that the appeal [on that issue or issues] should be taken to the Court of Appeals rather than to the Supreme Court, an uncertainty against which the plaintiffs may protect themselves by timely appeals to both courts."[15]

## IV. THE ANTI-INJUNCTION STATUTE

■ Defendants urge us further that this Court is without power to grant the injunctive relief requested, insofar as the complaint seeks to enjoin further administration of the Louisiana Bar Examination, which the LSBA asserts is a "Proceeding in a state Court" within the meaning of the federal anti-injunction statute.[16] The question of federal intervention in state court proceedings presents this Court with the task of striking properly the delicate balance between state interest and protection of federally created rights. However, as the Justices Harlan and Stewart noted in their concurring opinion in Younger v. Harris, 401 U.S 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), a federal court would more likely intervene in a state civil proceeding than in a state criminal proceeding. "The offense to state interests is likely to be less in a civil proceeding. A State's decision to classify conduct as criminal

provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law. By contrast, the State might not even be a party in a proceeding under a civil statute."[17] This motion by the defendants to dismiss on the pleadings must be decided after viewing the pleadings in the light most favorable to the plaintiffs and considering the allegations of bad faith enforcement of the statute concerning the bar examination, and the serious equal protection attack on the statutes under consideration.

While federal intervention in a state *criminal* prosecution may be justified on allegations of irreparable injury, bad faith and harassment,[18] the plaintiffs in this civil action have alleged irreparable injury, bad faith and a "chilling effect" on their right of association,[19] arguing that their choice of attendance at SU subjected them to the discriminatory actions of the defendants as alleged in the complaint. If such allegations are found to be supported by the evidence, federal intervention under the Civil Rights Act would be justified.

We hold, therefore, that the anti-injunction statute does not prohibit this Court from deciding the issues before us.

## V. MOTION OF THE DEFENDANT, LOUISIANA SUPREME COURT, TO DISMISS FOR FAILURE TO STATE A CAUSE OF ACTION[20]

■ The Louisiana Supreme Court is a named defendant. Service on the Court was requested through its Chief Justice. Service was made on a Deputy

---

15. *Wadmond*, supra, at 129.

16. 28 U.S.C. § 2283, which provides:
 "A court of the United States may not grant an injunction to stay proceedings in a State court except as authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

17. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), see concurring opinion of Justices Harlan and Stewart, at note 2.

18. Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Younger v. Harris, supra.

19. See, United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 425, 19 L.Ed.2d 508 (1968), on the right of association as a right protected by the First Amendment.

20. This motion was denominated as "motion to strike," but raised the issue that no cause of action has been stated against this defendant.

Clerk. Plaintiffs' suit is for injunctive relief and damages under the Civil Rights Act; however, such relief may be obtained only from a "person" within the meaning of the Act. It is the position of the Louisiana Supreme Court that it is not a person under the Act and, therefore, no cause of action has been stated against it.

In Zuckerman v. Appellate Div., Sec. Dept., Supreme Court of the State of New York, 421 F.2d 625 (2d Cir. 1970), the Court held that in a suit under the Civil Rights Act "it is quite clear that the Appellate Division is not a 'person' within the meaning of 42 U.S.C. § 1983. In Monroe v. Pape, 365 U.S. 167 at 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) it was held that * * * a municipal corporation is but a political subdivision of a state, [and] it has been held that the state itself is also not subject to suit under section 1983. (Williford v. California, 352 F.2d 474, 476 (9th Cir. 1965). It follows that the Appellate Division, as a part of the judicial arm of the State of New York, must also not be a 'person' within the purview of the section of the Civil Rights Act." (and cases cited therein).

Following the Court's reasoning in the *Zuckerman* case, the Louisiana Supreme Court, being the highest judicial member in the body politic of the State of Louisiana, is beyond the cognizance of the Civil Rights Act.

We note that the counsel for the plaintiffs offered no memorandum in opposition to the granting of this motion.

## VI. MOTIONS BY THEIR HONORS, THE CHIEF JUSTICE AND THE ASSOCIATE JUSTICES OF THE LOUISIANA SUPREME COURT

TO DISMISS, QUASH SERVICE, AND QUASH SERVICE OF INTERROGATORIES [21]

■ Plaintiffs have failed to follow the procedures set out in Rule 4, Federal Rules of Civil Procedure, for joining as parties defendant the individual members of the Louisiana Supreme Court. No individual member is named in the caption or in the complaint, and the only service on which plaintiff relies is the mailing through the ordinary mails of a nonconformed, uncertified copy of the complaint, without citation, and without any showing that the complaint had, in fact, been filed in the United States District Court for the Eastern District of Louisiana. This mailing was made on January 19, 1971.

On January 25, 1971, plaintiffs attempted to serve the Justices with copies of interrogatories by handing to counsel for the Court, in chambers, copies of the interrogatories.

It is clear that the Chief Justice and Associate Justices of the Louisiana Supreme Court were never made parties defendant to this lawsuit for lack of proper service of legal process. Counsel for the plaintiffs contended on oral argument that by naming the Louisiana Supreme Court as a party defendant, the individual members were thereby also made parties defendant. Although we find that service was improper and invalid as to the individual justices, it is clear that even had they been made parties through proper service and citation, they should be dismissed from this lawsuit.

■ A judge in the exercise of his judicial function is not liable in damages under the provisions of the Civil Rights Act.[22] No authority has been cited by

---

21. Justice Dixon of the Court filed a special motion urging as an additional ground that as suit was filed in November, 1970, and he became an Associate Justice in January, 1971, the suit was not brought against him. Since the relief sought is prospective as well as retrospective, Justice Dixon's position will be treated as those of the other Justices.

22. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

counsel for the plaintiffs in support of the continuance of this action against the individual Justices of the Supreme Court. There is no allegation that they conspired in any alleged scheme to prevent the plaintiffs from practicing law in this state, nor do plaintiffs allege that the Justices acted beyond the scope of their offices. Plaintiffs' reliance in their memorandum on the *Wadmond* case [23] is misplaced since, in this case, the injunctive issue does not arise out of a First Amendment situation, and plaintiffs have not cited, as indeed they cannot, any authority that there is a constitutionally protected right to practice law of comparable sanctity to the right of free speech. Neither have the plaintiffs alleged that the Justices conspired in any way to exercise a chilling effect on any of the plaintiffs' First Amendment rights.

Although plaintiffs' counsel urged on oral argument that the Justices of the Louisiana Supreme Court should not be allowed to "hide behind a cloak of immunity," it is settled jurisprudence that judges are immune from suits arising out of their judicial acts, and the Civil Rights statutes create no exception to that rule.[24]

VII. MOTIONS OF ROBERT G. POLACK, THOMAS RAGGIO, THE MEMBERS OF THE BAR ADMISSIONS ADVISORY COMMITTEE, THE MEMBERS OF THE COMMITTEE ON BAR ADMISSIONS, MEMBERS OF THE BOARD OF GOVERNORS, AND THE ASSISTANT SECRETARY TO THE COMMITTEE ON BAR ADMISSIONS TO QUASH SERVICE OF PROCESS AND DISMISS

■■■ Unconformed, uncertified copies of the complaint and amended complaint herein were delivered to movers by regular United States mail. Movers have not been named in the complaint or in the caption thereof. Nor were they served with process as prescribed in Rule 4, Federal Rules of Civil Procedure, i. e. the purported pleadings were not accompanied by summons, were not served by a United States Marshal, deputy, or any other person specially appointed by the Court, nor was any return of service made as required by Rule 4.

Executive Counsel Thomas Collins was named in plaintiffs' counsel's Certificate of Service as a member of the Board of Governors of the LSBA but is not in fact a member of that Board. Mrs. Helen Weil, Assistant Secretary to the Committee on Bar Admissions, was named as a member of the Committee, which she is not.

William G. Kelly, Jr. and Frank Voelker, Jr. have joined in the motion. They are members of the Board of Governors who have been informed that a certificate of service was filed reciting that a copy of the complaint and amended complaint were delivered to them by mail, but who aver that they did not receive the same.

The plaintiffs have offered no authority to support the purported service on these individuals. Kelly and Voelker have not been named in the lawsuit, and have not been served properly under Rule 4.

VIII. MOTIONS BY THE BOARD OF GOVERNORS OF THE LOUISIANA STATE BAR ASSOCIATION, THE COMMITTEE ON BAR ADMISSIONS, AND THE BAR ADMISSIONS ADVISORY COMMITTEE TO DISMISS THE COMPLAINT

■■■ Movers contend that since neither the Board nor the Committees named as defendants in this suit are legal entities, they should be dismissed. They are not unincorporated associations amenable to suit under Rule 17(b) (1)

---

23. *Wadmond,* supra.

24. Pierson v. Ray, supra; Saier v. State Bar of Michigan, 293 F.2d 756 (6th Cir. 1961).

and, thus, cannot stand in judgment. The LSBA, a named corporate defendant, is responsible for the actions of its Committees and Board, when acting within the scope of their authority under the Association's Articles of Incorporation. Therefore, the plaintiffs, having brought the LSBA before the Court, may obtain from it any and all relief appropriate for the actions of the LSBA's Board and Committees. The Court in AFPSC, Inc. v. Wadmond[25] was presented with a similar situation when the plaintiff sought to add as a party the Committee on Character and Fitness of the Bar of the Appellate Division of the New York Supreme Court. The AFPSC, Inc. court held that the Committee is not an unincorporated association, but is a creature of the state.

The corporate defendant, LSBA, in the instant case, has a charter which specifically provides for its Board and Committees; thus, the actions of these Committees and Board are attributable to the corporation.

The plaintiffs' opposition memorandum overlooks the fact that the LSBA's ultimate responsibility for the acts of its Board and Committees and their members performing official functions[26] precludes the necessity of their being joined in the suit, and fails to state sufficient basis for independent suit against the Board or Committees.[27]

### IX. MOTION BY THE DEFENDANT LSBA TO DISMISS THE PLAINTIFFS' SUPPLEMENTAL PETITION

By amended complaint, the plaintiffs have asserted that this suit is brought on behalf of themselves and on behalf of "all other black individuals who have taken and who will take the Louisiana Bar Examination as regulated by the existing Articles of Incorporation of the Louisiana State Bar Association. There are common questions of law and facts (sic) affecting all members of the class. The class is fairly and adequately represented by the plaintiffs herein."

Initially, we note that the class sought to be defined by plaintiffs consists not only of SU's black graduates, but of all black persons who will take or have taken the Louisiana bar examination. This class is proper, under Rule 23, FRCP, insofar as the complaint alleges the unconstitutionality of the Articles of Incorporation as applied to blacks. The proper class to assert the charge of facial unconstitutionality must be limited to graduates, black or white, of SU. The damage claim applies as well to both classes.

Within the larger class of SU graduates, we discern three sub-classes, each of which is represented by plaintiffs in the instant action: (a) graduates of SU who have taken the bar examination and passed; (b) graduates of SU who have taken the bar examination and never passed, and (c) SU students who will, in the future, take the bar examination.

Racial discrimination is, by its very nature, class discrimination. We find that the requirements of Rule 23(a) and (b) have been met by the plaintiffs. Joinder of all members of the classes defined in the complaint would be impractical; there are questions of law and fact common to the classes; the claims of the representative parties are typical of the claims of other members of the classes, and the representative parties will fairly and adequately protect the interests of the classes.

### X. MOTION OF THE DEFENDANT, LSBA, FOR A SUMMARY JUDGMENT

The defendant has moved for a summary judgment dismissing the plain-

25. 215 F.Supp. 648 (S.D.N.Y.1963).

26. The same situation prevailed in *Wadmond*, supra.

27. The affidavit of Thomas Collins, Executive Counsel of the LSBA, stands uncontroverted as a statement that the Board and the Committees are not legal entities, but are merely the Board and the Committees of the LSBA.

tiffs' complaint as it relates to discriminatory administration of the bar examination, as to the exclusion of representatives of law schools which are not members of the Association of American Law Schools, viz. SU, from the Bar Admissions and Bar Admissions Advisory Committees, and as to the exclusion of blacks from LSBA offices and committees. It would appear that the gravamen of plaintiffs' complaint under the latter theory is that since SU is not represented on those Committees, SU graduates are at a disadvantage when taking the bar exam.

*It must first be noted that the plaintiffs prior to hearing offered no countervailing affidavits in opposition to the volume of affidavits offered by the defendant in support of its motion.* The motion will be dealt with in three parts:

 A. exclusion of an SU representative from the Advisory Committee,

 B. discriminatory administration of the bar examination,

 C. alleged exclusion of blacks from other LSBA committees, its Board and offices.

■■■ A. Section 4 of Article 12, Articles of Incorporation of the LSBA, as earlier noted herein, provides that the Bar Admissions Advisory Committee shall be composed of one fulltime faculty member from each law school that belongs, at the time the faculty member is appointed, to the AALS, having been recommended by the President of the University having such law school.

Plaintiffs attack this provision on equal protection grounds. It must be noted at the outset that these Articles were signed on March 12, 1941, before SU had a law school,[28] so we cannot impute to the redactors of the articles any discriminatory purpose based on race.[29]

It must be further noted, given an equal protection attack, that the affidavit of

Dean Joseph Modeste Sweeney, Dean of the Tulane School of Law, filed by mover, states, contrary to the bald allegation of the plaintiffs in their memorandum in opposition to another defense motion, that the AALS is "A national organization of law schools in the nation that serves as an accrediting agency for law schools and has certain standards for their admission to membership."

■■■ Equal protection of the laws does not require that all persons in all matters be treated in exactly the same manner; neither does it prohibit any and all classifications.[30]

The Hackin court cited *Schware*, at 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796:

> "A State can require high standards of qualification such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law."

We must determine whether accreditation is a rational basis for classification of those schools which may be members of the Bar Admissions Advisory Committee.

In a supplemental affidavit, Dean Sweeney notes that since 1931 Howard University's Law School, a predominantly black institution, has been a member of the American Association of Law Schools, a non-discriminatory body, which admits to membership any applicant law school that meets its standards for accreditation.

In the *Hackin* case the Court discussed the unreasonableness of classifications in the context of bar admissions, and concluded that "an educational requirement of graduation from an accredited law school [is] not arbitrary, capricious, or unreasonable." This can be readily analogized to the LSBA's rationale that faculty members of certain

---

28. See Footnote 2, supra.

29. See also, affidavit of Thomas O. Collins, at pp. 1–2, and Footnote 3, supra.

30. Hackin v. Lockwood, supra.

committees relating to bar admissions be associated with accredited law schools.

This Court is concerned with the reasonableness of the classification. In Turner v. Fouche, 396 U.S. 346, 90 S. Ct. 532, 541, 24 L.Ed.2d 567 (1970), the Supreme Court stated that the traditional test for a denial of equal protection is whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective.[31]

Among others, the interests of the State in protecting the level of professional erudition of members of the Bar, its interest in advancing and expediting civil and criminal justice in the State, and its interest in protecting clients from inadequate, poorly educated and generally incapable and incompetent counsel, could provide a reasonable basis for the requirement that certain members of the Bar Admissions Advisory Committee be recommended by schools accredited by the national accrediting agency. Using these norms, we find that the classification is reasonable and the statutory requirement is justified.

There is no evidence that SU's absence from the Committee has had an adverse effect on its students' ability to prepare for and anticipate the kinds of questions to be used on the exam. Mrs. Weil's affidavit establishes that since the July, 1967 bar examination to date there has been forwarded to the dean of SU ten sets of each bar examination questions. Also, since the March examination of 1966, and for each examination thereafter to date, a copy of the report of the Bar Admissions Advisory Committee has been furnished to SU's dean.

■ B. The second part of LSBA's motion for a summary judgment addresses itself to the plaintiffs' allegations that the bar examination has been discriminatorily administered. Again, plaintiffs have offered no countervailing affidavits and have submitted a half page memorandum resting on the premise that the Court must construe matters on such a motion in favor of the plaintiffs.

We find from the depositions of the plaintiffs taken by the defendants that plaintiffs allege, concerning their discrimination charge, that:

i. blacks were told not to sit next to each other while a white married couple were allowed to sit in adjacent seats;

ii. the monitors spoke (not during the examination) to certain white examinees, but not to the blacks;

iii. Mrs. Weil, the Assistant Secretary to the Committee, addressed Etta Kay Hearn by name before having been told on that occasion Miss Hearn's name;

iv. the papers of black examinees were marked in such a way that the graders knew they were black and then deliberately gave them failing grades;

v. after the papers were graded, the fictitious names and real names were matched up and black students were failed while sons of prominent white families were automatically given passing grades.

Taking these allegations individually, each is denied by uncontroverted evidence in the record:

i. In Exhibit B–2 to the affidavit of Mrs. Helen Weil, entitled: "Instructions and information re examinations for admission to the bar of Louisiana," applicants are instructed as follows: "Do not sit next to your friend. If you do, you are apt to be moved." Mrs. Weil's affidavit reflects that one white couple, Mr. and Mrs. James C. Arceneaux III took the examination, and, since she did not know these applicants, they could have sat next to each other without her knowledge. Mrs. Weil stated further in her affidavit that she has no personal knowledge that they did in fact sit next

31. See also, generally, Tussman and ten-Broek, The Equal Protection of The Laws, 37 Calif. L.Rev. 341 (1949).

to each other. Even if the Arceneaux couple had taken adjacent seats, this isolated instance would not support a finding of racial discrimination.

ii. The affidavits of Monitors J. Mason Webster and Anna Robin relate to the second allegation of discrimination. Their affidavits reflect that in the July, 1970 examination:

(a) As monitors, it is their duty, among others, to circulate around the examination room to ascertain that order is maintained, that rules of procedure are followed, and to be available to answer questions on procedures. In performing this duty they did not watch any applicants more than others and specifically did not watch any black applicants more than white.

(b) During recesses and prior to and subsequent to examinations, it is quite possible that they did speak with some of the applicants. If this were true, and they do not recall this specifically, they did not speak to any black applicant simply because they were not acquainted with them and in no way intended discourtesy to such black applicants.

iii. The third charge is countered in the deposition of Mrs. Helen Weil taken by plaintiffs, in which she stated that at times she remembered the names of applicants who had had business with her at her office or who had taken the bar examination on a previous occasion. She also stated unequivocally that she had not placed any notation on examination books or otherwise indicating the race or real name of examinees.

iv. The affidavits of the monitors, Mrs. Weil, Mrs. Dorothy Kupper, who has custody of the safe in which the envelope containing the identification cards is kept, and of Lucille A. Martin, who has assisted Mrs. Weil in opening the identification cards-envelopes, establish that the real identities and races of the applicants have never been divulged to the examiners, and the envelopes have not been marked to indicate race or color of the examinees.

Mrs. Weil's affidavit and the exhibits thereto set out the procedure by which anonymous testing, grading, and recordation of grades is achieved.

As assistant secretary of the Committee on Bar Admissions of the LSBA, she has assisted this committee since 1964 in the receipt and processing of all applications to take the Louisiana bar examinations. The examination is given twice each year, usually in March and in July.

Upon being advised by the Committee on Bar Admissions as to the applicants approved to take the examinations, she advised each applicant by a letter (Exhibit A to her affidavit) that they were so approved and furnished to each, written instructions and information (Exhibits B–1 and B–2), a schedule of the examinations (Exhibit C) and a card (Exhibit D–1) and an envelope (Exhibit D–2). The envelope has no identifying mark except the printing of "Helen Weil, Assistant Secretary." The card has a space for the applicant's real name and the city in which applicant resides, and a space for a fictitious name, letter, and number. This card contains instructions shown on Exhibit D–1.

On the first morning of the 1970 examination, Mrs. Weil, with the assistance of Miss Robin and Mr. Webster, took the roll of applicants present. The roll call sheet had only the real names of the applicants, a space for identifying who was present or absent, and a space to check that the envelope containing the card with the fictitious name, letter and number had been turned in by each applicant. The two monitors and Mrs. Weil had each applicant hand in his or her envelope, and neither Mrs. Weil nor either monitor placed any mark or writing on any envelope.

When all sealed envelopes had been received, Mrs. Weil placed them in a large brown envelope which she sealed and marked on the outside:

"IMPORTANT—Do not open this envelope until the master sheet has been completed in its entirety as it

contains envelopes with cards showing fictitious names, letters, and numbers —as well as real names of the applicants taking the examinations."

She then placed this envelope in the steel safe at the LSBA office in the Supreme Court Building where it remained until September 2, 1970, on which day the Committee on Bar Admissions met to complete and promulgate the results of the examinations. She then inspected the sealed brown envelope and noticed that it had not been tampered with in any way. Mrs. Weil then took the large sealed brown envelope to the office of the law firm of Phelps, Dunbar, Marks, Claverie and Sims, 1300 Hibernia Bank Building, New Orleans, where, on September 2, 1970, the Committee was meeting. On the instructions of Chairman Frank McLaughlin, in an office separate and apart from the office in which the Committee was meeting, she, assisted by Mrs. Martin, opened the large brown envelope and each small sealed envelope, from which she removed the card containing the applicant's real name, city, fictitious name, letter and number. Mrs. Weil then placed these cards in alphabetical order according to the fictitious names. Mrs. Weil retained possession of the cards until she was advised by the Committee that all final grading was completed and entered on the master grading sheet and the examination papers destroyed. During her possession of the cards, Mrs. Weil did not allow anyone on the Committee to utilize or look at these cards, nor did she communicate to any member of the Committee any of the information contained on said cards. She then turned over these cards to the Committee so that this was the first and only time that they or anyone else could determine the real name of each applicant.

This is the same procedure that was followed in July, 1969, and March, 1970, because of the large number of applicants. Prior thereto the procedure was exactly the same as outlined herein, except that prior to July, 1969, she turned over to the Committee the master grading sheet on which were only the fictitious names and spaces in which the results were to be entered, and at the same time she turned over to the Committee a large brown sealed envelope in which were all of the small white sealed envelopes containing the real and fictitious names of the applicants, such deliveries to the Committee being made on the date that the Committee met to assign passing, conditioned, and failing grades.

Each examination paper was checked by Mrs. Weil to ascertain that there was no indication other than applicant's fictitious name, letter, and number. She prepared a grading sheet from the fictitious names, letters, and numbers taken from the examination papers with a blank space in which the assistant examiner was to place a grade. An example of the grading sheet used in 1970, Exhibit E–1 through E–9, did not contain the real names of the applicants, and was sent with the examinations to each examiner.

Mrs. Weil likewise prepared a master sheet (Exhibits F–1, F–2, F–3, F–4) from the examination papers, on which she put only the fictitious names, letters, and numbers of each applicant, a space for each of the nine subjects on which an examination is given and a space for the final results. This master sheet did not contain the real names of the applicants.

When the Committee met, she turned over this master list. She did not give any member of the Committee access to the cards which contained real and fictitious names, until she was notified that all final grading and results had been completed and entered on the master sheet opposite the fictitious name, letter and number, and the examination papers destroyed.

The Committee then wrote on the master sheet the real name of each applicant opposite his fictitious name, letter and number. Thereupon, for the first time, the Committee became aware of the true identities of the examinees.

The voluminous affidavits of the examiners and graders all attest to the fact that the grading of the papers is done solely on the basis of fictitious names, and no devices are used in the system to indicate the true identity or the race of any examinee. Not a scintilla of evidence to the contrary has been offered by the plaintiffs.

The procedure by which fictitious names and real names are matched, which is done after the papers have been graded, grades recorded to fictitious names, and the original papers destroyed, is attested to by Mrs. Weil. After having explained the elaborate procedure by which anonymity is assured, she states, "To my knowledge every conceivable effort has always been made to completely preserve the anonymity of each applicant and to specifically remove the possibility that an examiner, grader, or I or anyone else could determine the real name of any applicant until his examination papers are fully corrected, graded and destroyed. * * * If I thought or had any reason to believe that any applicant was discriminated against because of race, color or origin, I would resign my position rather than work under such alleged unfair practices."

v. Exhibit "G" to Mrs. Weil's affidavit shows that the offspring of judges, a past president of the LSBA, bank presidents and senior members of prominent New Orleans and Baton Rouge law firms, as well as law review members and members of the Order of the Coif have on occasion failed or conditionally failed the bar examination.

C. Passing on to the third allegation, that black members of the LSBA are not allowed fair representation on its Board and Committees or as officers or members of the House of Delegates, the lawyer plaintiffs have admitted on deposition and in answers to interrogatories that they have never sought Committee appointments or offered themselves for election to the Board or the House of Delegates or as candidates for any LSBA office. In addition, the uncontroverted affidavit of Thomas O. Collins, Jr., relative to this contention, states, *inter alia,* that any black member so desiring can place himself or herself on the election ballots to run for a seat on the Board of Governors and the House of Delegates of the LSBA. He further avers that Ernest N. Morial, a black member and now Judge of the Juvenile Court for the Parish of Orleans, did so run for a seat in the House of Delegates from Orleans Parish and won the seat in a highly competitive election. In the six years during which Mr. Collins has been executive counsel, Judge Morial was the only black member to have run for any LSBA office.

Collins attests further that during his six years as executive counsel no black member has ever initiated the available administrative procedures to amend the Articles of Incorporation providing that full time members of the faculties of Louisiana law schools nominated to the Board or appointed to the Bar Admissions Advisory Committee to represent such schools must be members of the faculties of schools accredited by the AALS. Collins' affidavit reflects further that blacks have been appointed to Committees,[32] citing by way of example, Revius Ortique, Jr., a member of the Special Committee on Disciplinary Enforcement and Judge Morial, a member of the Standing Committee on American Citizenship. Collins stated that he has never been approached by a black member seeking Committee participation. He further stated that as Executive Counsel he has always taken positive steps to insure that black members may and can participate in all functions sponsored by the LSBA and, specifically, that meetings are always arranged at such places where blacks will be accepted and allowed to participate. He further averred that the annual meetings of the LSBA held in Biloxi were attended by

32. We take judicial notice that the newly elected President of the LSBA sends to each member, in the Louisiana Bar Journal, a form to be filled out and returned to the LSBA if the member desires to serve on a committee.

black members who were readily accommodated at the Biloxi hotels.

After oral argument, plaintiffs filed two identical affidavits, in which deponents Clyde Tidwell and Charles White swore that:

"He had personal knowledge of the ability of some of the persons who took the bar examinations in the past;

"Those persons studied tediously and prepared thoroughly for the bar examinations taken by them.

"Those persons were able to go through all of the past bar examinations, extract all of the issues and answer them in accordance with the laws and jurisprudence of the State of Louisiana;

"These persons possessed a high level of ability and comprehension;

"These persons had no difficulty in writing and expressing their ideas;

"These persons took and failed the State bar examination;

"The only possible reason for their failing said bar examination was deliberate failures because of racial discrimination."

These affidavits prove nothing, since they are merely vague, conclusional statements by the deponents who, on the record, possess no qualifications to lend credibility or authority to their bald opinions.[33] The concluding remark is clearly only speculation, and has no weight in our determination of the issues raised by defendant's motion. In the face of the record as made in support of the motion, this assertion is clearly refuted, and we find expressly to the contrary.

Two other affidavits were filed by plaintiffs, neither of which raises an issue of fact.

Robert C. Williams deposed that he was admitted to practice law in this State in August, 1967, and:

"He had personal knowledge of the preparation and comprehension of one Miss Margrett Ford, now licensed to practice in the State of Louisiana;

"Miss Ford was just as prepared or more prepared as he was at the time the two of them took the Louisiana Bar Examination in July of 1967;

"He passed said bar examination and Miss Ford failed said bar examination;

"The problems on said bar examination were discussed between the two and the responsive answers were basically the same;

"Miss Ford's failing grade on said bar examination can only be attributed to racial discrimination or deliberate failure on the part of some of the examiners."

This affidavit does no more than substitute Mr. Williams' opinion for those of the examiners. Williams' final statement defies the laws of logic and syntax, and raises no issue of fact. Speculation and conjecture do not establish a genuine issue of material fact.

The plaintiff has offered the affidavit of Thomas Brown, who identifies himself as "having taught various courses at the [SU] Law School and worked with said students [SU graduates] in their studies and other school activities."

Brown states that:

"As to each and correlative with their level (sic) of achievement and respective grades they were possessed of requisite ability, comprehension, analysis and expression for such law study and should have been able to perform adequately on the State Bar examinations;

"He has studied and observed the percentage or rate of failure of such persons on said examinations and in his opinion the rate of failure was higher than the normal rate of failure by others taking said examinations and

---

33. Even if the students referred to in the affidavit had been able to answer, to affiants' satisfaction, questions found on previous examinations, it does not follow logically that they could answer, to the examiners' satisfaction, the questions on the examinations they did in fact take.

was higher than the normal expectancy of failure for any bar examination;

"That such variations in the failure rate on said bar examinations is (sic) highly suggestive of discrimination or either defect in the make-up, structure or administration of said examinations;

"This high probability of discrimination or defect in administration would seem to be more than verified in individual cases where persons of unusual ability and performance took and failed said examinations."

We can understand the reluctance of an educator to accept evidence of inadequacy in his students' education, and his eagerness to fix the blame for their failure on an outside agency; however, the fact remains that Brown's conclusions, though affirmed before a Notary, are merely his opinions concerning the reason for the failures of some SU students. As such, they do not controvert the facts established by movers. The plaintiffs cannot prevail by substituting bare conclusions for facts.

In oral argument, counsel for plaintiffs claimed, without identifying the deponent, that one of the affidavits filed by mover indicated that approximately eleven papers written by black applicants on torts and ethics in the July, 1970 bar examination had been referred to one assistant examiner. Counsel for plaintiffs argued that this circumstance was "suspicious" because "13 of the 14 applicants from Southern had failed." Again, counsel for the plaintiffs is found to be unacquainted with the established facts, for only eight SU students failed, while five conditioned and one passed. Apparently to support the claimed suspicious circumstance, plaintiffs urge the affidavit of grader Morgan Brian and the first page of his letter of August 26, 1970, addressed to examiner Edward Wegmann. Morgan Brian's affidavit and letter, filed in support of defendant's motion, do not support plaintiffs' contention, since Brian graded only four papers submitted by black applicants, and one of these, plaintiff Osborne, passed the bar examination.[34] The supplemental affidavit of Edward Wegmann, examiner in Torts & Ethics, filed by mover after argument, verifies that an approximately equal number of papers was sent to each of his assistant examiners, without regard to "numbers, letters, alphabetical arrangement, or any other plan or procedure except to divide them in rotation as equally as possible among the graders available" and the fact that papers submitted by four graduates of Southern were sent to grader Brian was "pure happenstance."

Plaintiffs also rely on the affidavit of Peter Feringa, filed by mover, in which Feringa stated that 84 papers were given to him and that, "out of the total graded by" him, 26 failed. In a supplemental affidavit, Feringa explained that the 26 failures were spread over the 5 years he has graded examination papers, that he graded only 18 papers in July, 1970, of which 3 failed and 3 were doubtful.[35] This statement is corroborated by the supplemental affidavit of Mr. Rufus C. Harris, who was the examiner under whom Feringa served.

We also note the uncontroverted fact established in the defendant's Second Request for Admissions, Nos. 64, 65 and 66, that in the last three bar examinations, eight black graduates of Louisiana law schools other than SU and four black graduates of out-of-state-schools applied for admission. Of these, ten passed, two conditioned and none failed, statistical results approximating those attributable to white examinees.[36]

34. The attached correspondence further establishes the complete anonymity of the applicants.

35. Doubtful papers are re-examined by the principal examiner in that subject.

36. 286 of 316 examinees passed unconditionally in July, 1970. See, defendant's unanswered first requests for admissions, #I-(f) and Exhibits F1, F2, F3 and F4 thereto.

On the record before us, the uncontroverted evidence compels the conclusion that no racial discrimination in the administration of the bar examination existed. The graders and examiners perform an onerous, voluntary job. Their integrity has been attacked by baseless opinion and conclusional statements by the plaintiffs, but no shred of evidence has been offered to impugn that integrity.

▉ The test of a "genuine issue of material fact" should be "considered along with the duty of the party against whom a summary judgment is moved to produce and serve opposing affidav-

its."[37] The papers filed by plaintiffs herein fail to raise a genuine issue of fact and fail to suggest any factual basis for the plaintiffs' charges of racial discrimination. When viewed in the light most favorable to plaintiffs, the record supports defendant's motion for summary judgment.

## XI. MOTION BY LSBA FOR DISMISSAL OR TO COMPEL ANSWERS TO INTERROGATORIES AND TO EXTEND TIME FOR COMPLETING DISCOVERY

Considering the conclusions we have reached on the other motions, this motion is moot.[38]

---

37. See, Rule 56, F.R.Civ.P. Rowan v. United States, 219 F.2d 51 (5th Cir. 1955). Conclusional allegations of the complaint or of affidavits cannot be relied on to withstand a motion for summary judgment. Daily Press, Inc. v. United Press Internatl., 412 F.2d 126 (6th Cir. 1969), cert. den. 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453; Turner v. Lundquist, 377 F.2d 44 (9th Cir. 1967). Neither do pleadings suffice as a substitute for opposing affidavits. First Natl. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), reh. den. 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188; Scarbaro v. Universal CIT Credit Corp., 364 F.2d 10 (5th Cir. 1966); Erickson v. United States, 340 F.2d 512 (5th Cir. 1965).

38. It appears from the affidavit of court reporter Helen Deitrich, that on February 27, 1971, at the close of the taking of depositions of certain of the plaintiffs (pursuant to court order), counsel for the LSBA inquired off the record of plaintiffs' counsel how many witnesses would be called at the trial of the case. Plaintiffs' counsel replied that they expected to use 40 or 50 witnesses.
Counsel for the Bar Association has annexed to his motion interrogatories which he propounded to the plaintiffs as a result of the disclosure of counsel concerning witnesses.
Interrogatory #1 asked the names and addresses of each "will call" witness. Plaintiffs' counsel responded, "It is undecided at this time what witnesses will be called to testify." Interrogatory #2 asked for "may call" witnesses, and plaintiffs answered, "See answer to Interrogatory #1." Interrogatory #3 asked plaintiffs to state the facts and issues to be proved by

each of the witnesses, to which plaintiffs again responded, "See answer to Interrogatory #1." Interrogatory #5 asked for a description of tangible evidence to be offered, to which plaintiffs replied by referring to their answer to Interrogatory #4. Interrogatory #4 asked plaintiffs to state facts pertinent to the issues that they expect to prove by any evidence other than witnesses and describe the documents or other evidence. The reply was, "We expect to prove that the Bar Association has been and is presently regulating the bar examination under what we consider to be unconstitutional regulations. We expect to prove this by submitting a copy of the Articles of Incorporation of the Louisiana State Bar Association as set forth in Volume 21A of West's Louisiana Revised Statutes, pages 122 through 179, as amended as shown in the pocket part of said Volume "For use in 1970, pages 12 to 17 thereof, and Louisiana Act 154 of 1940." Defendant seeks to compel answers to Nos. 1, 2, 3, and 5. Since by counsel for plaintiff's words at the deposition, 40-50 witnesses will be called, plaintiff must disclose to the defendant the names of his witnesses and the subjects concerning which they will testify. Plaintiff has not offered any objection to the scope of the questions, but has once again in this litigation given unresponsive answers to clear and proper questions by the defendant. (See, in this connection, the Court's Minute Entry of February 22, 1971.)
The defendant seeks, in conjunction with this motion, to have the discovery deadline extended so that discovery of these 40-50 witnesses may take place. The plaintiff has offered no opposition to either of these motions.

In the Court's Minute Entry of February 22, 1971, we reserved judgment on the defendant LSBA's motion for sanctions, costs and attorneys' fees. Having considered the record, it is the opinion of the Court that the defendant's motion should be and the same is hereby denied.

For the reasons hereinabove assigned, the following Motions are denied:

I. The Motion of the defendant, LSBA, to dismiss the complaint for lack of jurisdiction,

II. The Motions of defendants to dissolve three-judge court,[39]

III. The Motion of the defendant, LSBA, to dismiss the plaintiffs' supplemental petition,[40] and the following Motions are granted:

IV. The Motion of the Louisiana Supreme Court to dismiss for failure to state a cause of action,

V. The Motions of their Honors, the Chief Justice and the Associate Justices of the Louisiana Supreme Court to quash service and quash service of interrogatories and to dismiss,

VI. The Motions of Robert G. Polack, Thomas Raggio, and the members of the Bar Admissions Advisory Committee, the members of the Committee on Bar Admissions, members of the Board of Governors and the assistant secretary to the Committee on Bar Admissions to quash service of process and to dismiss,

VII. The Motions of the Board of Governors of the LSBA, the Committee on Bar Admissions, and the Bar Admissions Advisory Committee to dismiss the complaint.

VIII. The Motion of the LSBA for a summary judgment dismissing the complaint.

---

39. This motion, filed by the LSBA and Supreme Court, was joined in by all defendants except the Law Institute.

40. This motion, filed by the LSBA, was joined in by all defendants except the Law Institute.